**John DeWitt McDOWELL,
Plaintiff–Appellant,**

v.

**R.R. ROGERS, D.E. Ross, and R.L. Martin, Defendants–Appellees.**

No. 87–5730.

United States Court of Appeals, Sixth Circuit.

Submitted on Briefs March 29, 1988.

Decided Dec. 27, 1988.

John DeWitt McDowell, Henning, Tenn., pro se.

Charles V. Holmes, Memphis, Tenn., for defendants-appellees.

Before KEITH, MARTIN and NELSON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

Plaintiff John McDowell sued three Memphis police officers in federal court under 42 U.S.C. § 1983. Mr. McDowell's complaint, which he filed *pro se*, alleged in essence that the defendant officers had deprived him of unspecified constitutional rights by the unnecessary use of "brutal force" in effecting his arrest after an altercation between him and a private security guard.

Mr. McDowell tried his own case before a jury. After both sides had rested, the court directed a verdict for the three defendants. Mr. McDowell urges on appeal that this was error.

If the matter had not been taken away from the jury, and if the jury had believed Mr. McDowell's testimony and rejected the contradictory testimony of the defendant officers, the jury could have found that after Mr. McDowell had been handcuffed, and at a time when he was offering no resistance, one of the officers hit him with a nightstick, breaking a rib. No medical records could be found to confirm the story of a fractured rib, and the trial judge, "after listening to both sides and weighing all the proof," as he told the jury he had done, seems to have concluded that the officers' testimony was truthful and Mr. McDowell's was not.

Because this was not a bench trial, it was not up to the judge to weigh the credibility of the various witnesses. Taking the evidence in the light most favorable to the plaintiff, it seems to us that a jury could have found facts sufficient to justify the conclusion that Mr. McDowell's Fourth Amendment right to be secure in his person against "unreasonable" seizures was violated by the officer who allegedly hit Mr. McDowell with a nightstick. The judgment in favor of that officer will therefore be reversed. The conduct attributed to the other two officers did not deprive Mr. McDowell of any constitutional rights, in our opinion, and the judgment in favor of those officers will be affirmed.

I

The episode that led to the arrest began around five o'clock in the afternoon of May 6, 1981, when Mr. McDowell attempted to cash a stolen check at a Memphis grocery store. (Mr. McDowell was ultimately convicted on a criminal charge involving the stolen check, and was sentenced to imprisonment for life under Tennessee's habitual criminal statute.) After presenting the check, Mr. McDowell somehow got into a shoving match with the store's security guard; the guard was pushed to the floor, and Mr. McDowell ran out of the store.

Defendant Ronald R. Rogers, a Memphis police officer who happened to be in the store at the time, gave chase after telling the cashier to call the police. Although not then on duty, Officer Rogers was wearing his uniform and was carrying a pistol. Mr. McDowell knew that he was being chased by a policeman, and after jumping over a wooden fence and running into the courtyard of a nearby apartment complex, he tried to hide behind a Coke machine. Officer Rogers reached around the machine and grabbed Mr. McDowell ("almost chok[ing] the wind out of me," according to the latter's testimony), whereupon the officer, whose pistol was drawn, told Mr. McDowell he was under arrest.

Officer Rogers then holstered his weapon and handcuffed Mr. McDowell's hands together behind his back. The security guard came running up at this juncture, lost his footing on some moist ground, according to Officer Rogers, and grabbed onto Mr. McDowell. McDowell's version was that the guard "was mad about what had happened inside the store, and he just started hitting and beating me." Mr. McDowell did not claim to have been hit by Officer Rogers, in any event.

With peace restored, the three men started walking back to the store. Before they got there, they came upon a squad car that was responding to the call from the cashier. Mr. McDowell was driven back to the store in the squad car, and Officer Rogers continued walking.

Defendant R.L. Martin, the officer who was driving the squad car, parked the vehicle directly in front of the store. Officer Martin then went inside to interview witnesses, according to his testimony, leaving Mr. McDowell with his partner, the third defendant in this case, Officer Don Ross.

When Officer Rogers got to the parked squad car, Mr. McDowell was asked to get out of the car so that Officer Rogers could retrieve his handcuffs and be on his way. It was Officer Ross who changed the handcuffs.

Officer Ross—who had been on the force for only one month—testified that he accomplished the change of handcuffs by having Mr. McDowell bend forward over the trunk of the squad car so that the keyholes of the handcuffs could be reached conveniently. The officer put one of his legs between Mr. McDowell's, in accordance with standard procedure, opened the cuffs one at a time, and replaced them with his own cuffs. Mr. McDowell was making no trouble at this point, and Officer Ross' testimony—which Officer Rogers corroborated—was that Mr. McDowell then got back in the squad car without any untoward incident.

The fact that a number of people were going in and out of the store suggests that this would have been an odd time and place for Officer Ross to engage in misconduct even if there had been any motive for him to do so. (Officer Ross, like Mr. McDowell, is a black man, and it is not likely that there was any racial animosity between the two. Unlike the security guard, moreover, Officer Ross had not been pushed or knocked down by Mr. McDowell; the latter had been completely docile throughout the time he was with Officer Ross.)

Mr. McDowell testified, nonetheless, that after the new handcuffs were applied, and before he got back in the squad car, Officer Ross hit him twice with a nightstick—once above the knee and once in the side. (Mr. McDowell claimed that his hat had fallen off, and that Officer Ross "just crushed it up and throwed it on the back seat of the car. And I asked him why he do it—I asked Officer Ross why he do that. And

when I asked him that, that is when I got hit with the nightstick.") Officer Ross, on the other hand, testified that he had not even been issued a nightstick in May of 1981, and he said he never struck Mr. McDowell with anything. Officer Rogers corroborated this:

"Q. Did you see Officer Ross put him back in the car?

A. Yes, sir, I was with him.

Q. Did you at any time see Officer Ross strike the prisoner, Mr. McDowell?

A. No, sir, it was no need to.

Q. And after you got your handcuffs back, then that was the end of your involvement, is that correct?

A. Other than exchanging information, yes, sir.

Q. When you left Mr. McDowell, did you observe any visible injuries to him?

A. No, sir, there were none at the time."

After interviewing witnesses inside the store, Officer Martin made a call to a police lieutenant to arrange for authorization to place a felony charge against Mr. McDowell. On their way to the city jail with Mr. McDowell, Officers Martin and Ross stopped at a prearranged meeting place (the parking lot of a liquor store) to get the lieutenant's initials on the arrest ticket. Mr. McDowell testified that there were other officers there, and he said "they all gathered around the car and started ... using racial slurs, such as 'nigger', and [saying] we ought to kill you." Officers Martin and Ross both testified that the lieutenant was the only other officer at the liquor store, and they both denied that any verbal abuse occurred.

Mr. McDowell testified that before he got to the jail he asked Officers Martin and Ross to take him to the hospital "due to the fact that I was bleeding from my mouth and nose...." Mr. McDowell claimed that he was denied medical attention until about a day and a half later. Officers Martin and Ross both insisted that Mr. McDowell made no request for medical treatment. Officer Martin, for example, testified thus:

"Q. Did he ever complain to you about any physical injuries he had suffered or wanting to go to the hospital?

A. No.

Q. Did you notice any physical injuries, visible physical injuries to him?

A. No, I did not. Had I, I would have immediately transported him to the, at that time was the John Gaston Hospital, it is now the Regional Med, which is also standard policy and procedure any time there is visible wounds, blood or complaint of injury, we automatically transport to the Regional Medical Center to the prison facility there."

Mr. McDowell testified that on May 7 or 8, 1981, a day or two after his arrest, he was taken from the jail to the Regional Medical Center because of an "illness:"

"[A]fter I was treated for this illness, the doctor saw how swollen I was, and he says, what's wrong with you. And that's when I stated that I had been beaten by the police officer. And he said, well, I'm going to have an x-ray done on you, and the x-ray come back and he told me that I had a cracked rib. And there was no way that he could put anything on it because he could not dress the wound, it would just have to remain like it was. And he prescribed some medication for me, and that was it, and I went back to the city jail, and that's where I remained until I was bound over."

The records custodian at the Regional Medical Center testified that no medical records or x-rays relating to Mr. McDowell could be found for either May 7th or May 8th. The trial judge asked the witness to return to the hospital to see if she could find anything from May 9th or 10th of 1981, but she subsequently reported that she could find nothing for those days, or for May 11 or 12 either.

Mr. McDowell's sister testified that she visited her brother in the jail on the evening of his arrest and on the following day. She said that his face was bruised and scratched and he had "some kind of injuries to his stomach and ribs." The sister added that "he did look awful...."

At the conclusion of all the evidence the defendants moved for a directed verdict on the ground that there was no proof of any constitutional violation. Mr. McDowell asked the court to let the matter go to the jury, maintaining "that these officers did use excessive force in arresting me and harassing me to bring about this arrest. The officers didn't have to use physical force when I was not resisting arrest."

The trial judge acknowledged his obligation "to consider all of the evidence offered in the light most favorable to the plaintiff," but went on to say that "[w]hen the court weighs all of the evidence that has been presented in this case and looks at that evidence in terms of this legal standard ... the court has to grant the motion." The court assumed that the validity of the plaintiff's claim turned on whether there had been an infringement of the "liberty interest" protected by the Fourteenth Amendment, and the court seemed to think that no such infringement could have occurred because "there is really no proof of damages...." The sister's testimony "is so exaggerated," the court continued, "and varies so much from the plaintiff's testimony that I don't think the court ought to give her testimony much credence in making this decision." Emphasizing that no medical records had been found to support Mr. McDowell's testimony that his rib had been broken, the court concluded that "we have to face the ultimate reality here and that is that the proof of damages is just simply not here. And so what the court is going to do is grant the motion to dismiss the complaint against all three of these officers."

## II

In *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), a Memphis policeman's shooting of a fleeing suspect was held to be actionable under 42 U.S.C. § 1983 as an unreasonable seizure violating the Fourth Amendment strictures ("[t]he right of the people to be secure in their persons ... against unreasonable searches

and seizures, shall not be violated") that now bind state officers by reason of the Fourteenth Amendment. In the wake of *Garner*, a debate has arisen as to whether claims predicated on the intentional use of allegedly excessive force in making arrests ought to be analyzed in terms of the search and seizure clause of the Fourth Amendment or in terms of the due process clause of the Fourteenth Amendment. See, *e.g.*, the majority, concurring and dissenting opinions in *Gumz v. Morrissette*, 772 F.2d 1395 (7th Cir.1985), *cert. denied*, 475 U.S. 1123, 106 S.Ct. 1644, 90 L.Ed.2d 189 (1986); *Lester v. City of Chicago*, 830 F.2d 706 (7th Cir.1987); and *Justice v. Dennis*, 834 F.2d 380 (4th Cir.1987) (en banc).

This circuit has followed both approaches; see, *e.g.*, *Leber v. Smith*, 773 F.2d 101 (6th Cir.1985) (sheriff's deputy did not act "unreasonably," within the meaning of the Fourth Amendment, in drawing his gun when attempting to arrest emotionally disturbed motorist); *Lewis v. Downs*, 774 F.2d 711 (6th Cir.1985) (police officers who kicked a handcuffed woman and struck her husband and son with nightsticks in the course of arresting them violated plaintiffs' Fourteenth Amendment due process rights under a "shocks the conscience" test derived from *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952)); and *Dugan v. Brooks*, 818 F.2d 513 (6th Cir.1987) (complaint alleging that police officers stuck plaintiff with nightstick before arresting him stated colorable claim for violation of both the search and seizure component of the Fourth Amendment and "the substantive component of the due process clause of the fourteenth amendment").

Whatever legitimacy the concept of "substantive due process" may have in other contexts, it seems to us that in the case at bar, where the *pro se* plaintiff has cited no specific constitutional provision but has alleged that excessive force was intentionally used in effecting his arrest, there is no need to look beyond the Fourth Amendment in determining whether the plaintiff made out a jury case. In the face of a constitutional commandment that plainly says that "thou shalt not violate anyone's

right to be secure in his person against unreasonable seizure," our respect for the text of the Constitution ought to make us cautious about ignoring that commandment and asking instead whether the challenged seizure could be found to have run afoul of a commandment that says "thou shalt not deprive any person of life, liberty or property without due process of law." On the facts of the case before us, the former commandment seems far more pertinent than the latter.

There is no contention here, to be sure, that Mr. McDowell's person ought not to have been seized at all. Mr. McDowell is not complaining about the fact of the seizure, but about the manner in which it was carried out. *Garner* makes it clear, however, that if an otherwise reasonable seizure is accomplished through means that are unreasonable, in a constitutional sense, the seizure itself is "unreasonable" and thus unconstitutional. And the seizure that occurs when a person is arrested continues throughout the time the person remains in the custody of the arresting officers. *Robins v. Harum*, 773 F.2d 1004, 1010 (9th Cir.1985).

When it comes to assessing the reasonableness of the means used to seize the person of one suspected of a crime, we know of no better approach than that which Judge Friendly used, in a somewhat different context, in the leading case of *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir.1973):

> "In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

Under this approach, as Judge Friendly explained, "the constitutional protection is nowhere nearly so extensive as that offered by the common law tort action for battery, which makes actionable any intentional and unpermitted contact with the

plaintiff's person...." *Id.* "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Id. Cf. Oklahoma City v. Tuttle,* 471 U.S. 808, 817 n. 4, 105 S.Ct. 2427, 2432, 2435 n. 4, 85 L.Ed.2d 791 (1985). But our court has repeatedly found that a totally gratuitous blow with a policeman's nightstick may cross the constitutional line, see *Dugan v. Brooks,* 818 F.2d 513, *supra,* and *Lewis v. Downs,* 774 F.2d 711, *supra*—and, as we said in the latter case, "we do not believe that a serious or permanent injury is a prerequisite to a claim under Section 1983." *Lewis,* 774 F.2d at 714.

Mr. McDowell may not have suffered a "serious or permanent injury" as a result of the alleged blows with the nightstick that Officer Ross was supposed to have been carrying, but if such blows were administered at all, there was clearly no need for them. Everyone agrees that Mr. McDowell was handcuffed and that he was not trying to escape or to hurt anyone. The "need for the application of force" was thus nonexistent; the alleged force could only have been applied "maliciously," and the amount of force allegedly used was sufficient to break Mr. McDowell's rib, *ex hypothesi.* Although the other incidents of which Mr. McDowell complains are either trivial enough to fall below the constitutional threshold or can be justified by the exigencies of hot pursuit and the need to get a suspected felon to the police station to be booked, there is nothing trivial about a broken rib caused by a completely unprovoked and unnecessary blow from a policeman's nightstick.

■ The trial judge, who saw and heard all of the witnesses, obviously did not believe that Mr. McDowell had been hit by any nightstick. In passing on a motion for a directed verdict, however, a trial court is not entitled to weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury. See *Morelock v. NCR Corp.,* 586 F.2d 1096, 1104 (6th Cir.1978), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979). The court must view the evidence in the light most favorable to the party against whom the motion is made, and must give that party the benefit of all reasonable inferences; having done so, the court may grant a directed verdict only if the court finds that reasonable minds could not differ as to the governing facts. *Morelock,* 586 F.2d at 1104–05. A court may not grant a directed verdict on the ground that it believes one witness and not another. *O'Donnell v. Geneva Metal Wheel Co.,* 183 F.2d 733, 737 (6th Cir.), *cert. denied,* 341 U.S. 903, 71 S.Ct. 612, 95 L.Ed. 1342 (1950).

■ If the trial judge had let the case against Officer Ross go to the jury, as we think he ought to have done, perhaps the jury would have weighed the evidence the same way the judge did and returned a verdict in favor of the defendant. That would have ended the matter, of course. Had the jury returned a verdict that the trial court was convinced was against the manifest weight of the evidence, however, the court could have granted a new trial under Rule 59(a), Fed.R.Civ.P. A district court has power to order a new trial on its own initiative, see Rule 59(d), and the court has substantially more leeway in deciding whether to grant a new trial on the weight of the evidence than it has in deciding whether to direct a verdict. Against this background, we do not think it would have been unfair to allow the jury to express itself on the merits of Mr. McDowell's § 1983 claim against Officer Ross.

The judgment of the district court is AFFIRMED as to Officers Rogers and Martin, and the judgment is REVERSED as to Officer Ross. The case is REMANDED to the district court for further proceedings not inconsistent with this opinion.