NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0738n.06
Filed: October 5, 2006

No. 05-6660

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JIMMYRICO PIGRAM, By and Through
His Next Friend (Mother), LINDA
PIGRAM; and LINDA PIGRAM,

      Plaintiffs-Appellants,

v.

RUSSELL CHAUDOIN,

      Defendant-Appellee.

_____/

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE

Before: MARTIN and DAUGHTREY, Circuit Judges; and REEVES, District Judge.[*]

DANNY C. REEVES, District Judge. Defendant-Appellant Russell Chaudoin appeals the district court's denial of his motion for summary judgment. The sole issue on appeal is whether the district court erred in denying the Defendant-Appellant qualified immunity for an alleged slap and excessively tight handcuffs. For the reasons set forth below, we **AFFIRM** in part and **REVERSE** in part.

### BACKGROUND

---

[*] The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

This case arises out of the arrest of Plaintiff-Appellee Jimmyrico Pigram. Pigram was a student at Westside High School in Memphis, Tennessee. He suffers from manic depression and receives prescription medication for this condition. However, on April 22, 2003, Pigram did not have the correct amount of medication in his system because he had "skipped a dose" the night before. On that date, Pigram created a disturbance in his classroom. According to Pigram, he was "getting out of control" and was about "to get into a fight with [another] student." As a result, his teacher sought assistance from Officer Marcus Frierson, the Memphis Police Officer assigned to the school. Frierson handcuffed Pigram and took him outside. Frierson observed Officer Russell Chaudoin driving by the school and flagged him down for assistance. The parties dispute what happened after Frierson and Pigram reached Chaudoin's squad car.

### A. The Defendant's Version of Events

Chaudoin claims that, as Frierson started to put Pigram into his vehicle, Pigram began to resist by "bucking" and "pulling as if he was trying to get away." According to Chaudoin, he got out of his car and went around to assist Frierson in gaining control of Pigram. Chaudoin indicated that, during this time, Pigram was cursing and resisting the officers' efforts to place him in the car. At that point, Frierson indicated that he continued to hold Pigram and Chaudoin grabbed him. Once Pigram was safely restrained, Chaudoin removed Frierson's handcuffs and placed his handcuffs on Pigram. Chaudoin stated that he checked the cuffs for tightness and double locked them. He then placed Pigram into his squad car.

### B. The Plaintiffs' Version of Events

According to Pigram, when they reached the squad car, Chaudoin asked Frierson if he needed assistance and Frierson responded affirmatively. Chaudoin then asked Pigram his name and he

responded, but Chaudoin apparently did not understand him. Pigram admitted that he "got smart" with Chaudoin, and that Chaudoin got out of the car and said "something" to which Pigram responded "F*** you." At that point, Pigram alleges that Chaudoin "slapped" him and "took Officer Frierson's handcuffs off and put his on." Pigram testified that the cuffs were too tight when they were first placed on him and that he "think[s]" he "tried to" say something to Chaudoin "but [Chaudoin] would not listen." However, in a statement to the Memphis Police Department's Internal Affairs Bureau ("IAB"), when Pigram was asked if he told anyone that the handcuffs were too tight, he responded "[n]o he wouldn't listen."

Pigram's mother, Linda, testified that when she arrived at the high school, she observed her son cursing at Chaudoin. She stated that, at that point, Chaudoin got out of his car and slapped her son. She indicated that Chaudoin then removed his cuffs and "put them back on tighter"and that he was then placed in the backseat of the squad car.

The parties' versions of the events after the officers placed Pigram in the squad car are essentially consistent. Once in the backseat, Pigram began to strike his head against the plastic barrier separating the front and rear seats. The officers then attempted to secure Pigram's feet with a "rip hobble[1]." Chaudoin warned Pigram that if he did not stop kicking, he would be pepper sprayed. When Pigram did not comply, Chaudoin sprayed him and the officers were able to apply the rip hobble. Pigram was then transported to Juvenile Court by Chaudoin.

Jeanne Thompson, a juvenile court probation counselor, met with Pigram on April 22, 2003. During the meeting, she asked Pigram about his arrest. She indicated that she did not observe any

---

[1]      A rip hobble is described as a long nylon strap used for foot restraint.

bruises or other injuries to his wrists. In addition, she stated that Pigram had not mentioned "being slapped, tight handcuffs or any type of injury," other than being pepper sprayed.

On April 21, 2004, the Pigrams filed suit against the Memphis City Schools, Chaudoin, and the City of Memphis, alleging violations of 42 U.S.C. § 1983 for use of excessive force during Pigram's arrest. After dismissal of the Memphis City Schools and the City of Memphis, Chaudoin filed a motion for summary judgment. The district court determined that Chaudoin was entitled to qualified immunity on the pepper spray and rip hobble claims but denied qualified immunity for the alleged slap and application of the alleged overly-tight handcuffs. On October 14, 2005, Chaudoin filed an interlocutory appeal, seeking review of the portions of the district court's order denying qualified immunity.

## STANDARD OF REVIEW

In an interlocutory appeal from the denial of a motion for summary judgment on qualified immunity grounds, we have jurisdiction to review the legal question of whether qualified immunity should have been granted. *See Behrens. v. Pelletier*, 516 U.S. 299, 313 (1996); *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985). Review of the denial of qualified immunity is *de novo*. *Risbridger v. Connelly*, 275 F.3d 565, 568 (6th Cir. 2002).

## DISCUSSION

A qualified immunity analysis consists of two questions: first, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right; and second, if a violation could be made out on a favorable view of the parties' submission, was the right clearly established. *Saucier v. Katz*, 533 U.S. 194 (2001).

-4-

As *Saucier* directs, we must first determine whether Chaudoin violated Pigram's Fourth Amendment right to be free from excessive force. The Fourth Amendment's "objective reasonableness" standard governs the constitutional analysis in excessive force claims in the context of an arrest, investigatory stop, or other seizure. *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004). In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court held that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396. Courts must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. The reasonableness must be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*.

A.      **The Slap**

Chaudoin argues that he is entitled to qualified immunity in light of this Court's decision in *Lyons v. City of Xenia*, 417 F.3d 565 (6th Cir. 2005). In *Lyons*, an opinion reconsidered after the Supreme Court's ruling in *Brosseau*, this Court granted qualified immunity to a police officer for allegedly tackling a suspect who was engaged in a verbal argument with another officer. According to Chaudoin, "[i]f it was unclear whether a police officer violated an established constitutional right by tackling a person simply arguing with another police officer, there was no violation of a clearly established constitutional right if an officer simply slaps an angry, cursing, disorderly suspect who is apparently resisting arrest and trying to escape."

Chaudoin's argument fails for two reasons. First, it misconstrues the facts, at least as viewed in light most favorable to Pigram. Pigram admitted that prior to being put into the squad car, he was "angry" and "cursing." However, he specifically refuted the contention that he was "resisting arrest" or "trying to escape." Moreover, any violent behavior in which Pigram engaged inside the squad car, *i.e.*, banging his head against the glass and attempting to kick out the rear windows, should not be imputed to his *prior* behavior outside the car, when the alleged slap occurred.

Second, even though a "slap" would appear to involve less physical force than a "tackle," under specific circumstances, a slap may constitute a sufficiently obvious constitutional violation under *Brosseau* and *Lyons*. *See Lyons*, 417 F.3d at 579. For example, a tackle might legitimately be used to subdue an unruly suspect, especially if that suspect had not yet been secured in handcuffs, as was the case in *Lyons*. *Id*. at 570. In contrast, a slap to the face of a handcuffed suspect – even a verbally unruly suspect – is not a reasonable means of achieving anything more than perhaps further antagonizing or humiliating the suspect. *See also Carico v. Benton, Ireland & Stovall*, 68 Fed. Appx. 632, 637 (6th Cir. 2003) (noting that the plaintiff "can clearly claim excessive force against [the officer] for the slap to the face").

Under *Graham,* this Court is required to evaluate the reasonableness of Chaudoin's use of force by performing a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). Although the "right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," the officers' interest justifies only the amount of force that a reasonable officer in the heat of the moment could have believed was needed to effectuate the arrest.

In the present case, the slap cannot reasonably be construed as a means of subduing Pigram, especially given that Chaudoin's justification for the slap was not to protect himself, other officers, or the public, but rather was because Pigram had a "smart-ass mouth." Moreover, when Pigram's mother asked Chaudoin why he had slapped her son, Chaudoin allegedly replied that she was "lucky he didn't do more than that," which provides further evidence that the officer's action served no reasonable law enforcement purpose. On the facts as we must take them, there was simply no governmental interest in slapping Pigram after he had been handcuffed, nor could a reasonable officer have thought there was. This Court's case law supports Pigram's right not to be slapped gratuitously. Specifically, cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest. *See Phelps v. Coy,* 286 F.3d 295, 302 (6th Cir. 2002); *Adams v. Metiva,* 31 F.3d 375, 386 (6th Cir. 1994) (use of force after suspect incapacitated by mace would be excessive as a matter of law); *McDowell v. Rogers,* 863 F.2d 1302, 1307 (6th Cir. 1988) (blow with nightstick to handcuffed, unresisting suspect would be gratuitous and therefore unreasonable). Therefore, qualified immunity is not available for lack of a "clearly established" right. *See Saucier*, 533 U.S. at 200.

In summary, genuine issues of material fact exist regarding whether Chaudoin used excessive force in arresting Pigram, and whether that force was objectively unreasonable under the circumstances. We simply cannot find that the facts are so one sided in favor of Chaudoin that he is entitled to qualified immunity on the issue of whether a constitutional violation occurred as a result of the alleged slap. Accordingly, the district court correctly rejected Chaudoin's claim of qualified immunity.

B. **Handcuffs**

In *Lyons*, the Sixth Circuit noted that "[t]he Fourth Amendment . . . prohibits unduly tight handcuffing in the course of an arrest," stating that this general principle is "clearly established" under Sixth Circuit law for purposes of qualified immunity. *Lyons*, 417 F.3d at 575. However, the Court cautioned that:

> [n]ot all allegations of tight handcuffing . . . amount to excessive force. In order to reach a jury on this claim, the plaintiff must allege some physical injury from the handcuffing, and must show that officers ignored plaintiff's complaints that the handcuffs were too tight.

*Id*. at 575-76.

Although Chaudoin, Frierson, and Thompson deny that Pigram made any statements to them complaining about the tightness of the handcuffs, under the "light most favorable" standard we must examine Pigram's own statements to determine if he even alleged making statements regarding the handcuffs. In his statement to IAB, Pigram stated that his right wrist was swollen because Chaudoin put the handcuffs on too tightly. However, he reported that he did not inform Chaudoin of his discomfort because "he wouldn't listen." In contrast, during his deposition, Pigram testified that he noticed that the cuffs were too tight when Chaudoin first put them on and that he "think[s]" he "tried to" say something to Chaudoin about the tightness of the cuffs but that "he wouldn't listen," although Pigram could not remember when he said something.

Under *Lyons*, a plaintiff must demonstrate that he complained to the officers and that his complaints were ignored. In the absence of a complaint to the officer, no constitutional violation can be said to have occurred. It is clear from the record that Pigram failed to make a complaint inasmuch as he felt that any demands to the officers to loosen the handcuffs would have been futile, twice using the phrase "he wouldn't listen." There is nothing in the record to indicate that Pigram ever told

-8-

Chaudoin that his handcuffs were too tight. Therefore, unless there is evidence that there was an "obvious physical problem caused by the handcuffs," *i.e.*, that Chaudoin was on notice that the handcuffs were too tight, even in the absence of an express complaint from Pigram, no reasonable juror could find that Chaudoin had notice of the cuffs being too tight. *Lyons*, 417 F.3d at 576.

Here, there is likewise no evidence indicating that there was an obvious physical problem caused by the handcuffs. Ms. Pigram reported in her IAB complaint that while she was visiting her son at the juvenile facility, she noticed that his right wrist was "swollen and puffed upon from the handcuffs." While there is evidence indicating that Pigram complained to the guards at the facility that his "wrists were swelling and [that he] need[ed] to go on the south side and lay down," this evidence does not demonstrate that Pigram had an obvious physical problem *prior* to the time that he was surrendered to the juvenile guards. Thus, the court cannot conclude that Pigram had an obvious physical problem caused by the cuffs.

Because the facts as alleged by the Pigrams do not rise to the level of unconstitutionally excessive force, we reverse the district judge's denial of summary judgment on the grounds of qualified immunity as to the excessive-force handcuffing claim.

### CONCLUSION

Based on the above discussion, we **AFFIRM** the district court's denial of qualified immunity for the alleged slap and **REVERSE** the denial of qualified immunity for the alleged excessively tight handcuffs. The case is **REMANDED** for further proceedings consistent with this opinion.