Brian **BUXTON**, Plaintiff,

v.

Patrolman Nathan A. **NOLTE**, Defendant.

No. 3:05 CV 212.

United States District Court, S.D. Ohio, Western Division.

Feb. 12, 2007.

Eric S. Thompson, Gary James Leppla, Leppla Associates, Dayton, OH, for Plaintiff.

Bryan A. Niemeyer, Faulkner, Garmhausen, Keister & Shenk, Sidney, OH, Tabitha Dee Justice, Subashi, Wildermuth & Ballato, Dayton, OH, for Defendant.

## ENTRY AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, (DOC. 17-1), AND TERMINATING CASE

ROSE, District Judge.

Pending before the Court is Defendant's Motion for Summary Judgment. Doc. 17-1. Therein, Defendant asserts that Plaintiff failed to allege facts that rise to the level of a Constitutional violation, and that even if a Constitutional violation did occur, that Plaintiff did not demonstrate that such violation infringed on a clearly established Constitutional right. He asserts, therefore, that he is entitled to a qualified immunity defense. Because there is no clearly established Constitutional rule of law that would demarcate the force allegedly used by Defendant as excessive under the Fourth Amendment, Defendant's Motion for Summary Judgment will be granted.

## A. Background

On the evening of January 7, 2005, Plaintiff Brian Buxton went with his friend Sarah Wehrkamp to Cruisers, a local bar and grill in the Village of Russia, where they met Wehrkamp's friend, Melissa Baugher. Doc. 14-2 at 55–56. According to Buxton, he was introduced to an individual named Jace Grogean at Cruisers, but doesn't remember talking to or having any conversation with Grogean. *Id.* at 60–61. However, Grogean denies ever having met or talked to Buxton at Cruisers that evening. Doc. 15–2 at 12. While at Cruisers Buxton is unsure of how much alcohol he consumed, but stated that he had more than one beer which caused him to become slightly intoxicated. Doc. 14–2 at 59, 61, 67. Baugher indicated that she was drinking a lot that night and was drunk. Doc. 16–2 at 14. She also stated that Wehrkamp may "have had a couple," but is unsure of whether she was drunk because, she herself was too intoxicated to tell. *Id.* at 24. In addition, Buxton stated that it appeared to him that Wehrkamp was drinking and that he could tell that she was intoxicated. Doc. 14–2 at 66.

Buxton, Wehrkamp and Baugher left Cruisers in Wehrkamp's car sometime around 2:00 or 2:30 a.m. on January 8, 2005. Doc. 16–2 at 14; Doc. 14–2 at 66–68. Wehrkamp drove Baugher and Buxton to a local community center parking lot where they joined two other vehicles in sliding and doing donuts in the snow. Doc. 14–2 at 138–39; Doc 15–2 at 14–15. One of these vehicles belonged to and was driven by Grogean and the other by Jeremy Oakley, who was Baugher's boyfriend at the time. Doc. 15–2 at 14.

Baugher stated that she, Wehrkamp and Buxton didn't have any intentions regarding where they were going when they left the parking lot. Doc. 16–2 at 17. Buxton was under the impression that Grogean's parents were out of town and he was going to be having people back to his house because Wehrkamp and Baugher had mentioned that to him. Doc. 14–2 at 67. However, Grogean was planning on going to Oakley's house when he left the community center parking lot, but changed his mind and turned around in another parking lot, after deciding to go home instead. Doc. 15–2 at 15–16. After turning around Grogean thought that a police officer had seen him go through a stop sign without stopping and that the officer had turned around to come after him. Doc. 15–2 at 20. In fact, Defendant Officer Nathan Nolte, had seen him run the stop sign and

did turn around to pursue Grogean. Doc. 17–2, Exhibit 1 at 4.

When Grogean arrived at his house he found Buxton, Wehrkamp and Baugher on his front porch. Doc. 15–2 at 18. Wehrkamp had pulled into Grogean's driveway because they saw a police officer. Doc. 16–2 at 17–18. Grogean opened the door and let the three of them inside, brought them to the back door and told them to leave and not come back. Doc. 15–2 at 18. At this time, according to Grogean, he did not know who Buxton was, had never been introduced to him in the past and wasn't introduced to him then. Doc. 15–2 at 19–20. Unbeknownst to Grogean, after the three went out the back door, they went around to the side of the house and entered the garage. Doc. 14–2 at 79; Doc. 16–2 at 20; Doc 15–2 at 25. Then they reentered the house through a door in the garage that led to the interior of the house. Doc. 14–2 at 83; Doc 16–2 at 20. Once they were in the house Buxton went to the restroom and Wehrkamp and Baugher went into a bedroom. Doc. 14–2 at 84; Doc. 16–2 at 21.

A minute or two after Grogean let Buxton, Wehrkamp and Baugher out of his house, Officer Nolte knocked on his front door. Doc. 15–2 at 20. During these few minutes Grogean began to turn all of the lights off in the house, hoping that the police officer would think he wasn't home. Doc. 15–2 at 20. When Officer Nolte first questioned Grogean about driving his car, Grogean denied having done so. Doc. 15–2 at 21; Doc 17–2 at 4. Then he acknowledged that he was lying and admitted to driving his car. Doc. 15–2 at 21; Doc. 17–2, Exhibit 1 at 4–5. Officer Nolte and Grogean went outside so that Grogean could put up a window on his car and Officer Nolte could write Grogean a ticket for the stop sign violation. Doc. 15–2 at 22; Doc 17–2 at 5. Grogean asked Officer Nolte to go back inside to finish writing the ticket so they could get out of the cold. Doc. 17–2, Exhibit 1 at 5; Doc. 15–2 at 24.

When Officer Nolte and Grogean went back into the house they saw Buxton standing in the hallway. Doc. 15–2 at 24; Doc. 17–2, Exhibit 1 at 5. Officer Nolte and Grogean both questioned Buxton at the same time regarding what he was doing in the house. Doc. 14–2 at 88; Doc. 17–2, Exhibit 1 at 5; Doc. 15–2 at 24–25. Buxton admits that Grogean seemed surprised that he was inside the house. Doc 14–2 at 89. Buxton did not respond to Grogean's questions because he was more focused on what Officer Nolte was saying. Doc. 14–2 at 88–89. Officer Nolte ordered Buxton to come towards him and then to step outside, and the three of them went outside onto the front porch. Doc. 14–2 at 89–91; Doc. 17–2, Exhibit 1 at 5. Officer Nolte continued to question Buxton about what he was doing there, how he got in, etc. and Buxton responded that he wasn't doing anything wrong and that he had come there with friends from Cruisers, but didn't mention the friends' names. Doc. 17–2, Exhibit 1 at 5; Doc. 14–2 at 91–92; Doc. 15–2 at 26. Grogean observed that Buxton kept putting his hands in his pockets after Officer Nolte asked him to keep his hands where he could see them while they were outside on the porch. Doc. 15–2 at 25–26. Officer Nolte left Buxton on the porch briefly while he went to his cruiser. Doc. 14–2 at 96. Officer Nolte called for backup from Versailles. Doc. 17–2, Exhibit 1 at 5.

When Officer Nolte returned to the porch he told Buxton to turn around, place his hands on the wall, and face the wall so that he could pat him down. Doc 14–2 at 95. Buxton didn't have his legs spread, so Officer Nolte pulled Buxton's legs back and spread them apart with his legs. Doc. 14–2 at 96–98. Officer Nolte continued asking Buxton questions and when Buxton

turned around to answer one of these questions, Officer Nolte pushed him against the wall with his forearm. Doc. 14–2 at 97. When Officer Nolte pushed Buxton against the wall, Buxton's head made contact with the wall from which he suffered a minor cut on his forehead. Doc. 14–2 at 99. The cut had healed up before he went to the emergency room the next morning between 8:30 and 9:30 am. *Id.* at 145,152. Officer Nolte then placed handcuffs on Buxton "the way they are normally placed on someone." Doc. 14–2 at 105. At this time Officer Nolte was placing Buxton in investigative custody for officer safety and so that he could check the rest of the house for the friends that Buxton indicated that he had come there with. Doc. 17–2, Exhibit 1 at 5.

After handcuffing Buxton, Officer Nolte began to lead him from the porch to the police cruiser. Doc. 14–2 at 108. When Buxton and Officer Nolte turned the corner of the garage as they were walking from the porch to the police cruiser, Buxton fell to the ground onto his left hand, causing him to break a bone in his left wrist. Doc. 14–2 at 108–109, 154–55. Buxton gives two different versions of both the way in which Officer Nolte was leading him and what happened as they were turning the corner of the garage right before he fell. Doc. 14–2 at 108–115. First Buxton states that:

> We got to the corner of the drive, we went around, the corner, he was guiding me. I was almost off my feet the way he was moving me along the path with his hands. And as soon as we made the turn, he was guiding me, kind of talking to me at the same time, pushing me as we were talking. And then as soon as

we made that corner he shoved me, as soon as we made that corner that's when I went over. Slipped. Was knocked over by the way he was guiding me along the slick ground. Doc. 14–2 at 108–09.

Later, he describes the situation differently, "As soon as we made that turn, he made a little jerking motion to make the turn. To turn me. And as soon as that happened, my feet went out from under me." *Id.* at 113.[1]

After Officer Nolte placed Buxton in the police cruiser, Buxton asked Officer Nolte if he would move the handcuffs around to the front. Doc. 14–2 at 117. Buxton did not indicate to Officer Nolte why he wanted to handcuffs placed in front of him or that he was injured or needed any kind of medical treatment at anytime during the entire incident. Doc. 14–2 at 117–18, 127; Doc. 17–2 ¶ 12. Shortly after Officer Nolte placed Buxton in his police cruiser, Officer Hurd of Versailles P.D. arrived. Doc. 17–2, Exhibit 1 at 5. After receiving permission from Grogean, Officer Nolte and Officer Hurd searched the house, checking to see if anyone else was still inside. Doc. 15–2 at 30; Doc. 17–2, Exhibit 1 at 5. The two officers found Wehrkamp and Baugher in a bedroom lying on the floor next to the bed. Doc. 17–2, Exhibit 1 at 5; Doc. 16–2 at 24. Grogean indicated that he knew Wehrkamp and Baugher. Doc. 17–2, Exhibit 1 at 5. After asking the two girls a few questions, Officer Nolte was able to determine that Buxton had came with the girls to Grogean's house from Cruisers. Doc. 17–2, Exhibit 1 at 6; Doc. 16–2 at 27.

---

[1]. In contrast, Officer Nolte affies that, "At no time, while in my custody, did Mr. Buxton ever fall to the ground ... If Mr. Buxton had fallen, I would have included that information in my report immediately after the incident"

Doc. 17–2 ¶ 11, 13. Officer Nolte's report of the incident that took place on the morning of January 8, 2005 does not mention Buxton falling at any time. Doc. 17–2, Exhibit 1.

Officer Nolte removed Buxton from the police cruiser, took the handcuffs off of him and brought him inside. Doc 15–2 at 32; Doc. 17–2, Exhibit 1 at 6; Doc 14–2 at 123–126. Grogean said that he didn't wanted to press charges on anyone. Doc. 15–2 at 32. Officer Nolte asked Baugher and Wehrkamp if there was anyone they could call for a ride since they were intoxicated. Doc. 17–2, Exhibit 1 at 6; Doc. 15–2 at 32; Doc. 14–2 at 131–32; Doc. 16–2 at 28–29. Baugher indicated that they could walk to her grandmother's house since it is right behind Grogean's house. Doc. 14–2 at 131; Doc. 17–2, Exhibit 1 at 6. Officer Nolte offered to give the three of them a ride to Baugher's grandmother's house, and after some argument they agreed. Doc. 17–2, Exhibit 1 at 6; Doc. 14–2 at 131–134; Doc. 16–2 at 28–29. Officer Nolte took Buxton, Baugher and Wehrkamp to Baugher's grandmother's house and dropped them off. Doc. 17–2, Exhibit 1 at 6; Doc. 16–2 at 29; Doc. 14–2 at 134.

The next morning, Buxton was experiencing pain, swelling and bruising in his left wrist. Doc. 14–2 at 140,144–46. That same morning his parents took him to an emergency room where he learned that his arm was fractured. Doc. 14–2 at 145, 153. On July 10, 2005, Buxton filed suit against Officer Nolte under 42 U.S.C. § 1983, alleging that Officer Nolte violated his Fourth Amendment right to be free from unreasonable seizures, his right against excessive force, and under state law committed an unlawful arrest, assault and battery on Buxton. Doc. 1 ¶¶ 25, 31, 39, 44.

## B. Standard of Review

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and related case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505 (quoting Fed.R.Civ.P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in sup-

port of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the non-moving party and draw all reasonable inferences in the favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

## C. Analysis of the Fourth Amendment claims brought under 42 U.S.C. § 1983

### 1. Qualified Immunity

Officer Nolte raises the affirmative defense of qualified immunity. Doc. 5–1 ¶ 45. Under the doctrine of qualified immunity, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "Qualified immunity strikes a balance between compensating those who have been injured by official

conduct and protecting [the] government's ability to perform its traditional functions." *Wyatt v. Cole,* 504 U.S. 158, 168, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). Accordingly, "qualified immunity has been recognized to offset both the costs to defendant officials and the social costs of subjecting officials to the risks and expenses of trial, distraction of officials from their governmental duties, the diversion of official energy from pressing public issues, inhibition of discretionary action, and deterrence of able citizens from acceptance of public service." *Harlow,* 457 U.S. at 814, 816, 102 S.Ct. 2727.

The grant of qualified immunity to government officials ensures against the "risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). It gives officials the confidence they need "to perform their duties free from the specter of endless and debilitating lawsuits." *Torchinsky v. Siwinski,* 942 F.2d 257, 260 (4th Cir.1991). The ultimate purpose of granting officials qualified immunity is "to protect the state and its officials from over enforcement of federal rights." *Johnson v. Fankell,* 520 U.S. 911, 919, 117 S.Ct. 1800, 138 L.Ed.2d 108 (1997).

An "objective reasonableness" test is used to determine whether the official could reasonably have believed that his conduct was lawful. *Dietrich v. Burrows,* 167 F.3d 1007, 1012 (6th Cir.1999); *Creighton,* 483 U.S. at 641, 107 S.Ct. 3034. The Court uses such a wholly objective standard in determining whether to grant qualified immunity to a government official to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. Qualified immunity is more than a

mere defense to liability; it is an immunity from suit. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Qualified immunity is "effectively lost if a case is erroneously permitted to go to trial." *Id.*

■■■■ The initial burden of coming forward with facts to suggest that the official was acting within the scope of his discretionary authority as a police officer during the incident in question is upon the police officer. *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir.1991). Here, it is uncontested that Officer Nolte was acting within the scope of his employment as a police officer at all relevant times. Doc. 1 ¶ 24, 30; Doc. 5–1 ¶ 24, 30. This shifts the burden to the plaintiff to establish that a reasonable police officer in his position would have known that his conduct violated clearly established rights. *Wegener*, 933 F.2d at 392.

■■■ Buxton's brief suggests that the Court may not grant a qualified immunity because the facts relied upon are in dispute. Doc. 18 at 7. The Court is aware that the facts surrounding the alleged excessive force used by Officer Nolte are disputed, however when making a qualified immunity determination, the facts must be interpreted in the light most favorable to the non-moving party. Therefore, the Court will take the facts viewed in the light most favorable to Buxton, and if such facts establish that Officer Nolte violated Buxton's clearly established rights and that a reasonable officer would have known that he was violating such rights, Officer Nolte will not be entitled to summary judgment.

■■■ The Sixth Circuit uses a two-step process in performing a qualified immunity analysis. *Hoover v. Radabaugh*, 307 F.3d

460, 465 (6th Cir.2002). In the first step, the court considers whether, on the plaintiff's facts, there has been a constitutional violation. *Id.* Second, the court considers whether that violation involved "clearly established constitutional rights of which a reasonable person would have known." *Id.* (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir.1996)).

### a. Arrest Without Probable Cause

■■■■ The first count of the complaint asserts that Officer Nolte "placed Buxton under arrest without probable cause thereby violating his Fourth Amendment right to be free from unreasonable seizure of his person." Doc. 1 ¶ 25. The Fourth Amendment grants the right to be free from unreasonable seizure of one's person. U.S. Const. amend. IV. Arrest without probable cause is a violation of this Fourth Amendment right to be free from unreasonable seizure of one's person. *Dunaway v. New York*, 442 U.S. 200, 213, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). A person has been "seized" within the meaning of the Fourth Amendment when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Buxton was arrested, or seized, when he was handcuffed and placed in the back of a police cruiser.[2] Doc. 14–2 at 105, 116. A reasonable person would believe that he was not free to leave upon being handcuffed.

■■■■ Seizures are reasonable only if supported by probable cause. *Dunaway*, 442 U.S. at 213, 99 S.Ct. 2248. Generally, probable cause exists when "at the moment of arrest ... the facts and circum-

---

**2.** In fact, even before being handcuffed, Buxton was seized for purposes of the Fourth Amendment when Officer Nolte ordered him to place his hands against the house and he was aware, that he was, in fact, being detained.

stances within the police officer's knowledge and of which the police officer had reasonably trustworthy information . . . were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

■ Officer Nolte had probable cause to arrest Buxton. When Officer Nolte and Grogean walked back into Grogean's home, they found Buxton standing in the hallway. Doc. 15–2 at 24, Doc. 17–2, Exhibit 1 at 5. Grogean, the homeowner, was surprised to find Buxton in his home. Doc. 14–2 at 89. Grogean's questioning of Buxton regarding what he was doing in his house indicated to Officer Nolte that Buxton was there without Grogean's knowledge or consent. Doc. 14–2 at 88, Doc. 15–2 at 24, Doc. 17–2, Exhibit 1 at 5. The homeowner's indication that someone is in his home without his knowledge or consent is sufficient to warrant Officer Nolte in believing that Buxton was committing a crime. Officer Nolte could reasonably have believed that, at the very least, Buxton was trespassing on Gorgean's property. *See* Ohio Rev.Code Ann. § 2911.21 (LexisNexis 2006).

Despite Buxton's statements that he didn't do anything wrong and that he was there with friends, Officer Nolte believed, based on statements from Grogean, that Buxton was an intruder and that there were additional intruders in Grogean's home. Doc. 14–2 at 91–92. Because Officer Nolte reasonably believed that Buxton was committing a crime and that there were additional intruders in Grogean's home, he had probable cause to place Buxton under arrest. A reasonable officer would not allow a suspect to remain free when there is high likelihood that other suspects will be found and it is unclear whether those suspects pose a danger to the officer or the homeowner. Buxton has failed to show that there was a clear viola-

tion of his Fourth Amendment right to be free from unreasonable seizure of his person. Since the facts do not give rise to a violation of a clearly established constitutional right, Officer Nolte is entitled to qualified immunity on the arrest without probable cause claim.

**b. Excessive Force**

■ The second count of the complaint asserts that Officer Nolte's use of excessive force against Buxton was a violation of his Fourth Amendment right to be free from excessive force. Doc. 1 ¶ 31. Buxton alleges that Officer Nolte used excessive force when he led him from the porch to the police cruiser, causing him to fall and injure his wrist. Doc. 14–2 at 108–09, 113. Buxton also testified that Officer Nolte used excessive force in pushing his head against the wall with his forearm. Doc. 14–2 at 97–98. The Fourth Amendment grants the right to be free from excessive or unreasonable force by a police officer, including the right to be free from excessive force during an arrest. *Russo v. City of Cincinnati,* 953 F.2d 1036, 1044 (6th Cir.1992); *Martin v. Heideman,* 106 F.3d 1308, 1312 (6th Cir.1997).

■ Officer Nolte is entitled to qualified immunity unless his conduct violated a clearly established right of which a reasonable person would have known. In order to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Creighton,* 483 U.S. at 640, 107 S.Ct. 3034. In excessive force cases, qualified immunity operates to protect officers from the sometimes "hazy

border between excessive and acceptable force and to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." *Saucier v. Katz,* 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

Buxton's brief cites three cases in which officers were denied qualified immunity based on excessive force claims. The first case he cites, *Burden v. Carroll,* recognizes that a police officer cannot continue to use force once a reasonable officer would conclude that force is no longer justified by the circumstances. *Burden v. Carroll,* 108 Fed.Appx. 291, 294 (6th Cir. 2004) (citing *Phelps v. Coy,* 286 F.3d 295, 301 (6th Cir.2002)). The court added that this rule applies a fortiori where the level of force escalated needlessly into a particularly violent shove. *Burden,* 108 Fed. Appx. at 294. In *Burden,* the defendant police officer violently shoved the plaintiff, slamming him into a brick wall with protrusions that was a couple of feet away. *Burden,* 108 Fed.Appx. at 292.

The second case Buxton cites is *McDowell v. Rogers,* which stands for the general proposition that the malicious use of gratuitous force against cooperative suspects violates the Fourth Amendment. *McDowell v. Rogers,* 863 F.2d 1302, 1307 (6th Cir.1988). *McDowell* involves a handcuffed plaintiff who was dealt a totally gratuitous blow with a policeman's nightstick. *McDowell,* 863 F.2d at 1304. *McDowell* does not clearly establish that the use of *any* gratuitous force against

cooperative suspects violates the Fourth Amendment.[3] Rather it establishes that an uncalled for blow to a completely cooperative and handcuffed suspect, gives rise to a violation of the Fourth Amendment.

In *Solomon v. Auburn Hills Police Department,* a female plaintiff left a movie theater with her children upon two male police officers' orders. *Solomon v. Auburn Hills Police Dept.,* 389 F.3d 167, 171 (6th Cir.2004). When the officers directed her to come towards them in the lobby, one of them attempted to leg sweep her to knock her off balance. *Id.* The two officers then threw her up against the wall, slamming her head into a display case. *Id.* One of the officers had her pinned against the wall with his weight, his leg in between hers and twisted her arm behind her with such force that he fractured it in several places. *Id.* The plaintiff in *Solomon* was totally cooperative throughout the entire incident and did not pose a threat of flight. *Id.*

██ None of these cases squarely govern[4] Officer Nolte's conduct, but they do suggest that his actions fell in the "hazy border between excessive and acceptable force." *Saucier,* 533 U.S. at 206, 121 S.Ct. 2151. Qualified immunity is designed to protect officers against this hazy border. *Id.* The cases do not clearly establish that either of Plaintiff's versions of Officer Nolte's conduct violated the Fourth Amendment so as to put him on notice that his conduct was unlawful.

**3.** *See Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). Noting that, as a general proposition, the use of deadly force to stop a fleeing suspect could be unreasonable, the Court explained that only in an "obvious" case would such a general proposition of law ever be sufficient to overcome qualified immunity. Officer Nolte's conduct does not make out "obvious" case of excessive force, and so the general proposition that the use of gratuitous force against a

cooperative subject violates the Fourth Amendment is not sufficient to overcome qualified immunity.

**4.** Because the constitutionality of any particular use of force is highly fact sensitive, the individual seeking to overcome an officer's right to qualified immunity has the burden to point to cases that "squarely govern" the particular circumstances of the case at bar. *See Brosseau,* 543 U.S. at 198, 125 S.Ct. 596.

■ The first excessive force claim brought by Buxton asserts that Officer Nolte pushed his head against the wall with his forearm, which resulted in a minor cut which had healed by early the next morning. Doc. 14–2 at 97–98, 145,152. The fact that the injury resulting from Officer Nolte's pushing Buxton's head against the wall was so minimal indicates that the force he used in doing so was not excessive. Furthermore, Officer Nolte was justified in pushing Buxton's head against the wall. After being asked to face the wall, Buxton turned around while Officer Nolte was attempting to conduct the pat-down. Doc. 14–2 at 99–100. Officer Nolte was justified in turning Buxton back around by pushing his head against the wall because he needed to hold Buxton in place while he patted him down.

■ The second excessive force claim involved Officer Nolte's use of what Buxton describes alternatively as a shove or "little jerking motion" to turn Buxton around the corner of the garage, which caused Buxton to fall. Doc. 14–2 at 108–09, 113. Buxton does not allege that Officer Nolte *violently* shoved him as did the defendant in *Burden*. 108 Fed.Appx. at 292. Officer Nolte also did not render a completely gratuitous blow with either his person or any sort of weapon, such as the nightstick which was used in *McDowell*. 863 F.2d at 1304. Moreover, Buxton admits that the force was for the legitimate purpose of guiding him, rather than malicious.[5] In *Solomon* it was the grossly excessive direct force of one of the defendant officers in twisting the plaintiff's arm around behind her which caused her broken arm. 389 F.3d at 171.

It was reasonable for Officer Nolte to use some force in guiding Buxton to the police cruiser in order to maintain control over him. Officer Nolte needed to maintain control over Buxton to assist him in maintaining his balance because there was ice and snow on the ground and Officer Nolte believed that Buxton was intoxicated. Doc. 17–2 at 5. It was also reasonable for Officer Nolte to maintain control over Buxton for his own safety. Even if Officer Nolte's use of force in guiding Buxton was not entirely necessary, it does not rise to the level of excessive force necessary for a violation of the Fourth Amendment. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a [suspects's] constitutional rights." *Oklahoma City v. Tuttle*, 471 U.S. 808, 817 n. 4, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

■ Moreover, even if Officer Nolte's actions were objectively unreasonable, which they were not, they did not involve "clearly established constitutional rights of which a reasonable person would have known." *Hoover v. Radabaugh*, 307 F.3d 460, 465 (6th Cir.2002) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir.1996)). Thus, Nolte is also protected by qualified immunity because the unlawfulness of his conduct was not apparent. *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir.1999); *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir.1991).

## D. Conclusion

Because Officer Nolte is entitled to qualified immunity on the alleged Fourth Amendment violations of both arrest without probable cause and excessive force, the Court **GRANTS** Defendant's Motion for Summary Judgment, Doc. 17–1, with respect to the first and second counts of the complaint. The Court had supplemental jurisdiction over the properly asserted

---

**5.** "The Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct." *Brower v.* *Inyo County*, 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989).

state law claims of false arrest, assault and battery pursuant to 28 U.S.C. § 1367. However, a court may decline such supplemental jurisdiction where the court has dismissed all claims over which it had original jurisdiction. 28 U.S.C. § 1367(c)(3). The Court declines to exercise its supplemental jurisdiction over these matters. Buxton's state law claims are dismissed without prejudice to refiling in state court. The Clerk is **ORDERED** to enter judgment for the Defendant on all claims. The captioned cause is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.[6]

**DONE** and **ORDERED.**

---

6. The Court acknowledges the valuable contribution and assistance of judicial intern Jacklyn D. Knuckles in drafting this opinion.