RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0189p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

No. 09-3183

LOUIS ALDINI, JR.,

*Plaintiff-Appellee,*

v.

DUSTIN L. JOHNSON and TROY E. BODINE,
*Defendants-Appellants.*

Nos. 09-3183/3258

No. 09-3258

LOUIS ALDINI, JR.,

*Plaintiff-Appellant,*

v.

DUSTIN L. JOHNSON and TROY E. BODINE,
*Defendants,*

JOSHUA PAUL KACZMAREK and STEVEN R.
LEOPOLD,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 07-00183—Michael R. Merz, Magistrate Judge.

Argued: November 20, 2009

Decided and Filed: June 29, 2010

Before: MARTIN, BOGGS, and COLE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Victoria E. Watson, MONTGOMERY COUNTY PROSECUTOR'S OFFICE, Dayton, Ohio, for Defendants. Jennifer L. Branch, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, for Plaintiff. **ON BRIEF:** Victoria E. Watson, John A. Cumming, MONTGOMERY COUNTY PROSECUTOR'S OFFICE, Dayton, Ohio, for Defendants. Jennifer L. Branch, Alphonse A. Gerhardstein, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, for Plaintiff.

———————————

**OPINION**

———————————

BOYCE F. MARTIN, JR., Circuit Judge.  This is a 42 U.S.C. § 1983 excessive force case brought against four corrections officers at the Montgomery County, Ohio jail.  Louis Aldini, Jr. was beaten and repeatedly tased by several officers, allegedly including Officers Steven Leopold, Joshua Kaczmarek, and Dustin Johnson and Sgt. Troy Bodine.  The beating occurred while Aldini was being held in the booking room pending a completion of the booking process but after he had been surrendered to the jailers by his arresting officer.  After discovery, all four defendant officers moved for summary judgment on the bases of qualified immunity and on the substance of the claims.  The district court determined that Aldini's claims, and thus the officers' claims of qualified immunity, should be analyzed under the Fourteenth Amendment.  The court applied the Fourteenth Amendment's "shocks-the-conscience" standard rather than the Fourth Amendment's reasonableness standard because Aldini was no longer in the custody of the arresting officer at the time of the beating.  Using that standard, the court determined that Officer Johnson was not entitled to qualified immunity, that Officers Leopold and Kaczmarek were entitled to qualified immunity, and that it was for a jury to determine whether Sgt. Bodine was entitled to qualified immunity.

The most important question before us is whether the Fourth or the Fourteenth Amendment applies to pre-trial detainees in the process of booking but after they are no longer in the custody of the arresting officer.  The Supreme Court has deliberately left the question of what law protects these post-arrest, pre-conviction detainees vague, and we have never addressed this precise question.  We find that the Fourth Amendment protects pre-trial detainees arrested without a warrant through the completion of their probable-cause hearings and thus find that the district court erred in applying the Fourteenth Amendment.

This error was harmless in the case of Officer Johnson because actions that violate the Fourteenth Amendment necessarily violate the Fourth Amendment.  However, we cannot say that the error was harmless for the remaining defendants because, although the qualified immunity decisions may remain the same under the Fourth Amendment analysis as they were under the Fourteenth Amendment analysis, some are likely to vary.

We therefore **AFFIRM** the district court's decision as to Officer Johnson, but we **VACATE** the district court's decision as to the remaining defendants and **REMAND** their cases for analysis under the Fourth Amendment.

## I.

### A.    Factual Background

Aldini was a twenty-four year-old Air Force First Lieutenant based at Wright Patterson Air Force Base in Montgomery County, Ohio in 2006. After midnight on May 13, 2006, Aldini was asked to leave Hammerjax, a Dayton, Ohio bar, where he was celebrating his birthday with friends. He kicked the door on his way out, breaking the glass. He claims that he apologized and offered to pay for the damage, but that the bouncers nevertheless took him to the ground. He was arrested for "criminal damaging" and disorderly conduct by Dayton police officers who were nearby. Officer Chad Jones, an arresting officer, testified that Aldini was screaming and fighting during the arrest.

Aldini arrived at the Montgomery County Jail at 2:11 a.m. for booking and detention. The booking process could not be completed until Aldini's photograph was taken. Officer Johnson, a civilian detention officer, was tasked with taking Aldini's photograph. Aldini was told to wait in the booking area, a large room with telephones where detainees waiting to be booked are on one side and detainees who have been booked are on the other side. While Aldini was in the booking area waiting to be photographed, he repeatedly asked for a phone call so he could ask his friends to post bond. Aldini testified that he must have "pushed their buttons" and "got on their nerves" because he had asked too many times for his phone call; however, it does not appear that he yelled, swore, or became abusive. He was told to go into cell 134, one of the cells lining the back wall of the booking room, and Aldini complied. The cell door was not closed on Aldini, and no other detainee was in the cell.

As Officer Johnson[1] started to walk away from the cell, Aldini raised his voice and said, "hey," and demanded to make a call. Officers Johnson and Kaczmarek testified that Aldini was standing in the door at this time. Officer Johnson became

---

[1]According to Aldini's deposition testimony, he cannot identify by name any of the corrections officers with whom he had physical contact. Where possible, the officers have identified the person involved at each stage of the confrontations.

irritated with Aldini's persistent demands to use the phone. Officer Johnson turned around, said "that's it" and moved towards Aldini. Johnson entered the cell and started running toward Aldini. Aldini, thinking he was about to be cuffed, backed up, placed his hands behind his head, and said "I'm not resisting." Officer Johnson pushed Aldini up against the back wall of the cell and brought Aldini's hands down. Aldini testified that he did not think that this behavior was excessively forceful and thought that he probably deserved this treatment. Officer Kaczmarek stated that he heard yelling and that Aldini was preventing Officer Johnson from closing the door to cell 134. However, Officer Johnson stated at his deposition that, when he decided to close the door on Aldini's cell, Officer Johnson was in the doorway and Aldini was five to six feet away and the doorway could easily have been closed.

At this point, other officers, including Sgt. Bodine, Officer Kaczmarek, and Officer Steven Leopold, arrived in the cell. Aldini testified that he was then spun around, taken to the ground, and "viciously beat[en]" and kicked. Aldini stated that he never resisted, constantly said he was not resisting, was in a submissive position, and repeatedly said "cuff me." The officers held his body—face down and elevated above the floor—with a person holding each leg and arm in a crucifix or Vitruvian Man position. The officers punched and kicked him and said "how do you like taking these orders officer."[2] Aldini screamed for help but no one came to stop the beating, which continued for several minutes. Then, the officers brought in the taser.

Aldini testifies that Sgt. Bodine said nothing before he tased Aldini at least twice over a span of 10 minutes. Sgt. Bodine states that he only tased Aldini twice, at 2:51 a.m. for nine seconds and at 2:55 a.m. for five seconds. Aldini screamed for them to stop. Aldini testified that someone said that Aldini was going to die in the jail that night and that the officers asked him why he did not just pass out and what kind of drugs he was on. Aldini said "just kill me" because he felt like he was being tortured, but the officers, who may have numbered between five and seven, laughed. When the officers

---

[2]We assume that the officers were referring to Aldini as an "officer" because Aldini was a First Lieutenant in the Air Force.

were finished, around 3 a.m.,**³** Aldini was bleeding profusely, with blood coating his face, and asked for help.

In response, they took him to another cell, put a hood or mask on him, and restrained him in a chair. Aldini testified that he was scared and was afraid they would beat him again once he was tied down. Officer Jones, the arresting officer, testified that, while he was waiting to get his handcuffs back after surrendering Aldini to the custody of the jail, he heard Aldini yelling and screaming in the booking room and saw many corrections officers there with him.

Sometime later, the officers brought Aldini to the desk to sign papers and then returned him to the restraint chair, which they had moved to a different room. This second session in the restraint chair was preserved on videotape, which started recording Aldini in the restraint chair at 4:05 a.m. According to the video, Aldini appears calm and submissive while he was restrained. The jail took photographs of Aldini's injuries while the hood or mask was on his face. These photographs clearly show Aldini's injuries from the beating.

Aldini's friend and girlfriend paid his bond. After he was released from the restraints at 6:00 a.m., he was ordered to clean his face to remove the blood for his booking photo. Soon after he cleaned his face, he was photographed and released. Aldini's friends then took him to Miami Valley Hospital where he was treated. Medical records indicate that he had a 3 cm laceration over his left eye and a 1 cm laceration on his face, requiring a total of six sutures. He had at least six twin taser marks on his back. His head showed signs of trauma including multiple areas of swelling and bruising. He also had bruising on his back and skin irritation on his wrists. Aldini's whole body was in pain, including the side of his head, his nose, neck, and back. Aldini admitted that he had been drinking that night but denied the use of any drugs. A negative drug test confirmed this statement. The Dayton Police arrived and photographed Aldini and took

---

**³**Sgt. Bodine testified that the time on the taser report was wrong and should have said it was 4:05 a.m. when he first tased Aldini. However, there is a video of Aldini in a restraint chair that starts at 4:05 and lasts to 6:00 that shows no tasings in those two hours. Thus, the tasing had to have taken place before 4 a.m.

his statement.  However, although Dayton Police have searched for them, the statement and photographs have disappeared.

## B.       Procedural Background

Aldini brought suit under 42 U.S.C. § 1983 against Officers Johnson, Kaczmarek, and Leopold, Sgt. Bodine, and two other officers[4] on May 11, 2007, claiming that he was "viciously beaten" at the Montgomery County Jail.  He claimed that the officers deprived him of his civil rights as secured by the Fourth and Fourteenth Amendments and that their actions otherwise constituted an assault and battery and intentional infliction of emotional distress under Ohio law.

Following discovery, the officers moved for summary judgment on all claims based on qualified immunity and on the substance of the claims.  On January 27, 2009 the district court granted Officers Leopold and Kaczmarek's motion for qualified immunity based on the Fourteenth Amendment standard and entered summary judgment for Officers Leopold and Kaczmarek on all claims.  The district court denied qualified immunity to Officer Johnson and Sgt. Bodine on Aldini's section 1983 and state law claims.  Officer Johnson and Sgt. Bodine timely appealed their denial of qualified immunity (09-3183), and Aldini timely appealed the grant of qualified immunity to Officers Leopold and Kaczmarek (09-3258).

## II.

Government officials, including police officers, are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights. *Hills v. Kentucky*, 457 F.3d 583, 587 (6th Cir. 2006).  Stated differently, a "defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established."

---

[4]Aldini dismissed his claims against the other officers on August 28, 2008.

*Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (citing *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)).

Until recently, courts used the two-step sequential inquiry set forth in *Saucier v. Katz*, 533 U.S. 194 (2001), to address an assertion of the qualified immunity defense. Under *Katz*, a court first asked whether, viewed in the light most favorable to plaintiff, the facts show that the officer's conduct violated a constitutional right. *Id.* at 201. If the answer to this first question was "no," the analysis proceeded no further and the officer need not even seek the protection of qualified immunity. *Id.*; *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008).

If, however, the pleadings establish that there is a genuine issue of material fact as to a violation, *Katz* mandated that the next step was to determine whether the constitutional right was "clearly established" at the time of the violation. If not, the officer would be entitled to qualified immunity. *Katz*, 533 U.S. at 201. Under the "clearly established" inquiry, the question is whether the right was "so 'clearly established' that a reasonable official would understand that what he is doing violates that right." *Parsons*, 533 F.3d at 500 (quoting *Charvat v. E. Ohio Reg'l Wastewater Auth.*, 246 F.3d 607, 616 (6th Cir. 2001)). "This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." *Katz*, 533 U.S. at 201. Previously, this Court has included a third inquiry to "increase the clarity" of the *Katz* analysis: "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Floyd*, 518 F.3d at 405 (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005)).

However, in *Pearson v. Callahan*, __ U.S __, 129 S. Ct. 808 (2009), the Supreme Court recently abandoned *Katz*'s requirement that courts must address the qualified immunity inquiries sequentially. *Id.* at 813. However, because *Pearson* left in place *Katz*'s core analysis, all pre-*Pearson* case law remains good law. *Jones v. Byrnes*, 585 F.3d 971, 975 (6th Cir. 2009).

**A.        Under What Amendment Should Aldini's Claim be Analyzed?**

Section 1983 does not confer substantive rights but merely provides a means to vindicate rights conferred by the Constitution or laws of the United States.   "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  "[T]he two primary sources of constitutional protection against physically abusive governmental conduct" are the Fourth and Eighth Amendments.  *Id.*  The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-force claims that "arise[ ] in the context of an arrest or investigatory stop of a free citizen," *id.*, while the Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences.  *See Whitley v. Albers*, 475 U.S. 312, 318-322 (1986).  When neither the Fourth nor the Eighth Amendment serves to protect citizens, courts have applied the Fourteenth Amendment.  *Lanman v. Hinson*, 529 F.3d 673, 680-81 (6th Cir. 2008).

The Supreme Court has deliberately left undecided the question of "whether the Fourth Amendment continues to provide protection against deliberate use of excessive force beyond the point at which arrest ends and pretrial detention begins."  *Graham*, 490 U.S. at 395 n.10.  A circuit split has emerged from this legal "twilight zone," *Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir. 2000), with courts choosing between the Fourth Amendment and the Fourteenth Amendment[5] to protect those arrested without a warrant between the time of arrest and arraignment.[6]  The standards of liability for these causes

---

[5]Though the officers argued for its application here, as the district court correctly noted, the Eighth Amendment does not apply to this incident because Aldini was not at that point a convicted prisoner.  *Phelps v. Coy*, 286 F.3d 295, 299-300 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 395).

[6]The majority of circuits hold that the Fourth Amendment applies until an individual arrested without a warrant appears before a neutral magistrate for arraignment or for a probable cause hearing or until the arrestee leaves the joint or sole custody of the arresting officer or officers.  *See Wilson v. Spain*, 209 F.3d 713, 715-16 (8th Cir. 2000); *Barrie v. Grand County*, 119 F.3d 862, 866 (10th Cir. 1997); *Pierce v. Multnomah County*, 76 F.3d 1032, 1042-43 (9th Cir.), *cert. denied*, 519 U.S. 1006 (1996); *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989); *McDowell v. Rogers*, 863 F.2d 1302, 1306-07 (6th Cir. 1988).  The Fifth Circuit, while generally taking the position that substantive due process applies after the act of arrest, *see Valencia v. Wiggins*, 981 F.2d 1440, 1443-45 (5th Cir.), *cert. denied*, 509 U.S. 905 (1993), has concluded that the relevant constitutional provisions overlap and blur in certain factual

of action vary widely, *see Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001) ("A substantially higher hurdle must be surpassed to make a showing of excessive force under the Fourteenth Amendment than under the 'objective reasonableness' test of [the Fourth Amendment]. . . ."), and which amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between. *See Gravely v. Madden*, 142 F.3d 345, 348-49 (6th Cir. 1998).

As we noted in *Phelps*, if the plaintiff was a free person at the time of the incident and the use of force occurred in the course of an arrest or other seizure of the plaintiff, the plaintiff's claim is governed by the Fourth Amendment's reasonableness standard. 286 F.3d at 299-300 (citing *Graham*, 490 U.S. at 395). That standard requires that an officer's use of force be objectively reasonable, balancing the cost to the individual against the government's interests in effecting the seizure, and entails "deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Id.* (citing *Katz*, 533 U.S. at 204-05). The officer's subjective intentions are irrelevant to the Fourth Amendment inquiry. *Id.* (citing *Graham*, 490 U.S. at 397).

On the other hand, if a plaintiff is in a situation where his rights are not governed by either the Fourth or the Eighth Amendment, the Due Process Clause of the Fourteenth Amendment protects the individual against physical abuse by officials. *Darrah*, 255 F.3d at 305-06. Specifically, "[i]t is clear . . . that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham*, 490 U.S. at 395 n.10. According to the Supreme Court, a pre-trial detainee is one who "has had only a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.'" *Bell v. Wolfish*, 441 U.S. 520, 536 (1979) (citing *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)).

---

contexts. *See Petta v. Rivera*, 143 F.3d 895, 910-14 (5th Cir. 1998) (noting that Fourth Amendment standards are sometimes used in analyzing claims technically governed by substantive due process). Other circuits hold that after the act of arrest, substantive due process is the proper constitutional provision because the Fourth Amendment is no longer relevant. *See Riley v. Dorton*, 115 F.3d 1159, 1161-64 (4th Cir.) (*en banc*), *cert. denied*, 522 U.S. 1030 (1997); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996); *Wilkins v. May*, 872 F.2d 190, 192-95 (7th Cir. 1989), *cert. denied*, 493 U.S. 1026 (1990).

In *Phelps*, we acknowledged that Fourth Amendment protections do not vanish at the moment of arrest. "Our cases refute the idea that the protection of the Fourth Amendment disappears so suddenly." 286 F.3d at 300. There, we specifically applied the Fourth Amendment to an excessive force claim where the allegedly excessive force was used during the booking process by the arresting officers, to wit:

> We have explicitly held that the Fourth Amendment reasonableness standard governs throughout the seizure of a person: "[T]he seizure that occurs when a person is arrested continues throughout the time the person remains in the custody of the arresting officers." *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988). In *Cox v.Treadway*, 75 F.3d 230, 241 (6th Cir. 1996), Judge Ryan, writing for the court, stated that the constitutional analysis does not instantly change the moment a suspect is subdued by the police and that "creating a different Fourth Amendment standard applicable to the use of force in a post-arrest situation than is applicable to pre-arrest conduct [would introduce] a distinction in meaning of the Fourth Amendment that is found nowhere in its language." While the continuing seizure rule is not universally accepted in other circuits, *see Fontana v. Haskin*, 262 F.3d 871, 879-80 & n.5 (9th Cir. 2001) (detailing circuit split on this issue), it is the law in this circuit and has been since *McDowell*.

*Id.* at 300-01.

In this case, the district court correctly noted that our most recent decision in this area held that Fourth Amendment protections continue during booking. *Id.* The district court stated that it was still an open question as to how far the Fourth Amendment's protection extended beyond the transfer of custody from the arresting offices —although we had already found that such protection applies at least through the completion of the booking procedure, which is typically handled by jailers. We have not held that Fourth Amendment protections extended no farther than the situation in *Phelps*, and we now turn to the question of how far that protection does extend.

There is no principled basis in the text of the Constitution, the precedents of the Supreme Court, or our prior cases for placing a dividing line between protection by the Fourth and the Fourteenth Amendment at the end of custody of the arresting officer, at the completion of booking, or at the initial placement of the arrestee in a jail cell. As the

Supreme Court has "made it clear that *the legal status* of the victim of the excessive force determines [which a]mendment governs his excessive force claims," *Gravely*, 142 F.3d at 348-49 (emphasis added), it would be anomalous for the commencement of the Fourteenth Amendment's protections, by contrast, to hinge upon logistical criteria alone.

Placing the dividing line at the probable-cause hearing for those arrested without a warrant does, however, have a basis in Supreme Court precedent. The Court noted in *dicta* in *Wolfish* that individuals who have *not* had a probable-cause hearing are not yet pretrial detainees for constitutional purposes. 440 U.S. at 536. Thus, unlike the arrestee's transfer out of the arresting officer's custody or the completion of booking procedures, the probable-cause hearing is a judicial proceeding that affects the "legal status" of the arrestee, constitutionally authorizing his detention throughout the proceedings against him, just as a guilty verdict affects his "legal status" by authorizing his detention for the duration of his sentence. Consistency with our pronouncement that "the legal status of the [plaintiff] determines [which a]mendment governs his excessive force claims", *Gravely*, 142 F.3d at 349, requires extending the Fourth Amendment's protection until this change in legal status occurs.

Moreover, in *Gerstein*, the Supreme Court observed that "[b]oth the standards and procedures for arrest *and detention* have been derived from the Fourth Amendment and its common-law antecedents." 420 U.S. at 111 (emphasis added). It continued:

> The consequences of prolonged detention [without a judicial determination of probable cause] may be more serious than the interference occasioned by arrest. . . . When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty. Accordingly, we hold that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest.

*Id.* at 114. *Gerstein* held that this hearing must come "promptly after arrest." *Id.* at 125. Citing *Gerstein*, both the Ninth and Tenth Circuits have reasoned that, because the Fourth Amendment controls the permissible *duration* of "warrantless, post-arrest, pre-arraignment custody," it must also "apply to evaluate the *condition* of such custody."

*Pierce*, 76 F.3d at 1043 (internal citations omitted) (emphasis in original); *accord Austin v. Hamilton*, 945 F.2d 1155, 1160 (10th Cir. 1991) (same). Additionally, establishing the line between Fourth and Fourteenth Amendment protection at the probable-cause hearing creates an incentive to hold the hearing as soon as possible, which is certainly beneficial to the judicial process. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 58 (1991) ("Everyone agrees that the police should make every attempt to minimize the time a presumptively innocent individual spends in jail."). We therefore join the Ninth and Tenth Circuits in setting the dividing line between the Fourth and Fourteenth Amendment zones of protection at the probable-cause hearing.[7]

In this case, it is undisputed that the beating and tasing took place in the middle of the booking procedure, because Aldini's photograph had not yet been taken, and prior to a probable-cause hearing. Thus, the district court erred in applying the Fourteenth Amendment standard to an arrestee detained following a warrantless arrest prior to a probable-cause hearing.[8]

## B.     Was the Error Harmless?

As noted above, actions that do not violate the Fourteenth Amendment's shock-the-conscience standard may nevertheless violate the Fourth Amendment's reasonableness standard for excessive force. *See Darrah*, 255 F.3d at 306 ("A substantially higher hurdle must be surpassed to make a showing of excessive force under the Fourteenth Amendment than under the 'objective reasonableness' test of [the Fourth Amendment]. . . ."). Thus, while force found to shock the conscience under the Fourteenth Amendment will necessarily violate the Fourth Amendment's reasonableness

---

[7]The Ninth and Tenth Circuits hold that, at least in the case of a warrantless arrest, the Fourth Amendment applies until the arrestee "is taken before a magistrate judge, or other judicial official, to determine whether the arrest and continued detention were based on probable cause." *Barrie v. Grand County*, 119 F.3d 862, 866 (10th Cir. 1997); *see also Pierce*, 76 F.3d at 1042-43. More recent Seventh Circuit dictum echoes this principle. *See Brokaw v. Mercer County*, 235 F.3d 1000, 1018 n.14 (7th Cir. 2000). The Eighth Circuit has similarly applied the Fourth Amendment post-booking but before release on bail, without setting a bright line. *See Wilson*, 209 F.3d at 714-16.

[8]The situation in this case differs from those in which an individual is arrested pursuant to a warrant, as probable cause has already been found in those cases.

test, force that does not shock the conscience may nevertheless be unreasonable under the Fourth Amendment.

The Fourth Amendment's standard only permits an officer to use reasonable force to protect himself from a reasonable threat. As we noted in *Lawler v. City of Taylor*:

> Fourth Amendment excessive-force inquiries require a "careful balancing" of the force used "against the countervailing governmental interests at stake," and we have held that there is "simply no governmental interest in continuing to beat [an arrestee] after he ha[s] been neutralized, nor could a reasonable officer [think] there [is.]" Accepting Lawler's testimony as true and giving his evidence the benefit of all reasonable inferences, we conclude that he has raised a cognizable excessive-force claim because a jury fairly could find that Lawler never posed a threat to [the officer's] safety (making [the officer's] takedown excessive) and could find that he was not a threat once he hit the floor (making [the officer's] knee strikes and elbow jab gratuitous).

268 F. App'x 384, 387 (6th Cir. 2008).

Thus, as the district court found that the actions of Officer Johnson violated the Fourteenth Amendment, the court's error in not applying the Fourth Amendment was harmless with respect to Officer Johnson. However, the district court denied summary judgment for Sgt. Bodine and granted qualified immunity to Officers Leopold and Kaczmarek. Although we make no finding as to how the district court should rule on remand, a review of the record leads us to believe that a different result could be possible under the Fourth Amendment for these officers. Therefore, the error does not appear to be harmless for Sgt. Bodine and Officers Leopold and Kaczmarek.

**III.**

For the foregoing reasons, we **AFFIRM** the district court's decision as to Officer Johnson, but we **VACATE** the district court's decision as to the remaining defendants and **REMAND** their cases for analysis under the Fourth Amendment.