NOT RECOMMENDED FOR PUBLICATION
File Name: 10a0511n.06
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Aug 13, 2010**
LEONARD GREEN, Clerk

| | |
|---|---|
| WILLIAM TOTMAN, | ) |
| | ) |
| Plaintiff–Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| LOUISVILLE JEFFERSON COUNTY | ) |
| METRO GOVERNMENT and | ) |
| CHRISTOPHER HORNBACK, | ) ON APPEAL FROM THE UNITED |
| | ) STATES DISTRICT COURT FOR THE |
| Defendants–Appellees, | ) WESTERN DISTRICT OF KENTUCKY |
| | ) |
| and | ) |
| | ) OPINION |
| UNKNOWN DEFENDANTS, Louisville | ) |
| Metro Corrections Officers and Nurses in the | ) |
| Employ of Louisville Jefferson County Metro | ) |
| Government, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| _____ | ) |

**Before: CLAY and GILMAN, Circuit Judges; and ZATKOFF, District Judge.***

**RONALD LEE GILMAN, Circuit Judge.** After his arrest on a drug charge, William
Totman was brought to a detention facility run by the Louisville Jefferson County Metro
Government (Metro). While going through the booking process, Totman created a disturbance and
became involved in a physical altercation with several corrections officers. He later brought suit

---

* The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting
by designation.

against Metro, Officer Christopher Hornback, and several "Unknown Defendants," alleging the use of excessive force against him in violation of his constitutional rights. The district court granted summary judgment in favor of the defendants, concluding that Totman had failed to offer any evidence showing that the force used by Officer Hornback was excessive or that any custom or policy of Metro had harmed Totman. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Record evidence

#### 1. *Totman's deposition testimony*

After being arrested for the possession of marijuana on the evening of March 5, 2006, Totman and his girlfriend, Leslie Hughes, were brought to the "passive-booking section" of a Metro detention facility in Louisville, Kentucky. The male and female detainees were separated by a four-foot-high wall. These holding areas were adjacent to the photograph and fingerprinting area, which was behind a counter.

Corrections Officer Stavros Stachoulas called Totman up to have his photograph taken. As Totman passed the women's section, he told Hughes that he had already called a lawyer. When Totman spoke to Hughes, Officer Stachoulas said: "If you talk to your girlfriend again, I'm going to put you both in the hole[,] and it don't matter to me." Totman replied: "Is it my fault you can't get a date?" After making this comment, Totman turned around and began to walk away. Totman could not remember during his deposition whether his photograph had been taken at that point.

He described what happened next as follows:

> I turned around. One [of the officers] grabbed one arm, and one grabbed the other; and they kind of ran with me a little bit and bounced me on the floor on my head. And I'm screaming, begging them to stop. Somebody throws a knee in my back. Somebody is kicking me. I'm not seeing exactly who's doing what. All I'm doing is on the ground face down feeling everything, and I'm screaming and hollering and begging them to quit. And each one of them are individually going, "Quit resisting."

Totman did not know the exact number of officers involved, but he said there were at least three or four, including Officers Stachoulas and Hornback.

When asked how he ended up on the floor, Totman testified at his deposition: "By the two officers taking my arms and pretty much pile-driving me head first into the concrete." He then related what happened after he was on the floor:

> Actually after I was on the ground, I—I can't really say what anyone other than the—they was [sic] all twisting and . . . somebody threw a knee in my back, and somebody was kicking me in the legs. And one—I guess the commander or whoever comes crawling out of the office, and he yanks my head back and Maces me. Then they overextend my arm backwards. They take me to the hole, handcuff me to my feet, roll me in on [t]he bed. My head hits the bed. They're walking towards me. I'm thinking I'm getting ready to die. And they continue kicking me around a little bit, you know, roughing me up a little bit. Nothing major back there.
>
> But I heard a little voice say, "Be real still."
>
> And I just kind of acted like I was dead, you know, like knocked out or something because I kind of felt like I was really getting ready to get hurt worse because no one could see what was fixing to happen. I just—No one could see what was going on now, you know, other than the [corrections] officers.

Totman was handcuffed and taken to the single-cell holding area, which he referred to as the "hole." He recalled Officers Stachoulas and Peterson being the officers who took him to the hole, and he thought that Officer Hornback might have escorted him as well. Officer Stachoulas allegedly

told Totman that Stachoulas could come into the hole and "do that" to Totman anytime, and that Totman was powerless to do anything about it.

Immediately after Totman was placed in the hole, two nurses came in and put a cleansing solution in his eyes to stop the burning from the spray. Totman said that he was then left handcuffed in the hole for several hours. When the officers came back to the hole, one of them asked him: "Are you going to behave now?" Totman responded: "Yes." The officers then removed Totman's handcuffs and took him back out to the booking area.

### 2. *Officer Hornback's deposition testimony*

During his deposition, Officer Hornback testified concerning the events of the evening in question as follows:

Q. I want to ask you about—kind of switch gears and ask you about the incident involving William Totman, the reason why we're here today and what you recall about that incident?

A. What I can remember about the incident with Mr. Totman is that him[,] and I don't know if it was his wife or his girlfriend, right now I'd have to look at the paperwork to see if they were married or not. At any rate, they were both arrested at the same time and they were a couple. While they were in passive booking I remember them being given several warnings to stop communicating with each other.

Q. Who gave those warnings?

A. I know I did. Officer Stachoul[a]s gave them several warnings and I'm not positive but I think some other officers may have said something too but I know me and Officer Stachoul[a]s gave them multiple, multiple warnings to stop communicating and that that was against the rules and that it is mainly for their safety. . . .

Anyway, this continued on, I don't know however long they were sitting out in the passive booking area and we just continued to try and process them

-4-

through and then right as we were starting to have serious problems with Mr. Totman he was getting his picture taken. Officer Stachoul[a]s was taking his picture and Mr. Totman was refusing to face the camera and he kept wanting to try and talk to his girlfriend or wife and Officer Stachoul[a]s kept telling him to stop. . . .

Mr. Totman just refused to follow our instructions. He would not do what we asked him to do . . . .

. . . .

So as I was standing there at the live scan machine Officer Stachoul[a]s was still having difficulty with Totman following instructions. He finally said, you know this is your last warning, you know, either you follow our instructions or we are going to put you in the single cell and you are going to, you know your process is going to be delayed while we work with people that are going to cooperate.

Mr. Totman just refused. Even after that he refused to listen to Officer Stachoul[a]s, so Officer Stachoul[a]s said okay that's, you are going to the—we call it the hole. It's a single cell there on the booking floor so that we can, you know, we can still observe what you are doing in there but until you decide you are going to cooperate with us, you know, that is generally where we put people that are being uncooperative.

Officer Stachoul[a]s went to escort him over to the cell and Mr. Totman, you know, raised his elbow up before Stachoul[a]s could even, you know, do anything. So Stachoul[a]s grabbed his arm in an escort hold and started walking toward the single cell. I was walking right behind them and then Mr. Totman continued to be combative at that point with [O]fficer Stachoul[a]s, trying to jerk his arm back away from Officer Stachoul[a]s so I stepped around to his, I believe it was his right side and I grabbed his right arm to try and help Stachoul[a]s keep control of him and to help escort him to the single cell. As I did that, you know, he kept jerking his arms and started kicking his legs trying to kick us and, you know, he was jerking around good enough to where I actually lost ahold of him and he was swinging his arm around, you know, trying to hit us and things. So, at that point I just stepped in closer to him and I put him in a vascular restraint hold and my intentions at that point was to put him on the ground so that we could get him handcuffed and better control him. You know the reason why we put them on the ground, it's

always safer on the ground for everybody. When you are standing up that still gives people a chance to throw punches and kicks at you.

So at that point we went to the ground. I just kept his upper body secured in that vascular restraint hold and while Officer Stachoul[a]s and the other officers got his hands put in handcuffs and while they were doing that he was trying to kick and stuff. I couldn't see exactly what he was doing because I had ahold of his upper body but I believe he was still trying to kick the officers and that is when the Sergeant ran up and hit him with the OC [pepper] spray.

At that point I was also hit with the OC spray once again and so I just held on to him and until they told me that his hands were secured in restraints and that we could let him up. So after his arms were secured in the handcuffs I let go of him and stood up and the other officers escorted him back to the rear security area to a single cell back there. I can't remember which one. I didn't go back there. I stayed out in the passive booking area because I was covered in that OC spray, so I stayed out there and washed up from that and keep an eye on the other inmates that were out there.

Q.     Did you have any other contact with William Totman after he was taken back to the single cell?

A.     No, sir.

Officer Hornback testified that the force he used was in direct response to the resistance of Totman. He specifically denied that he put his knee on Totman's back while the latter was on the ground. When asked why he used force to begin with, Officer Hornback responded:

When I first put him in the original escort hold he was attempting to swing at Officer Stachoul[a]s and he pulled his arm away and was jerking his arm. I don't know if he was going to turn around and hit Stachoul[a]s or not. So, to keep a fellow officer from being attacked I stepped in and helped him.

According to Officer Hornback, the whole incident in the booking area lasted about 5 to 10 seconds, and it took place behind the counter that separated the holding area from the photograph and fingerprinting area.

-6-

### 3. Additional witnesses and evidence

Hughes, Totman's girlfriend, was also deposed regarding this incident. On the date in question, Hughes was in the women's section of the booking area, and she heard an officer call for Totman to get his photograph taken. Hughes observed Totman and Officer Stachoulas get into a dispute, and she heard Totman say: "Is it my fault you can't get a date?" According to Hughes, Officers Stachoulas and Hornback then "tackled" and "slammed" Totman. She testified: "Well, I heard [Totman] scream. I mean he was squealing like a pig. Please get off me. Please get off me. Squealing I mean it seemed like it—I know it was three to five minutes, but it seemed like thirty minutes." Despite Totman's pleas for the officers to stop, Hughes said "they kept saying quit resisting, quit resisting."

Much of Hughes's view of the altercation was blocked by the counter separating the photograph and fingerprinting area from the holding area where she was sitting. She saw Officers Stachoulas and Hornback grab Totman by the arms and take him to the floor, but was then unable to see more than Officer Hornback's head and neck because he was bent over. Hughes also saw "three to four officers just stomping." She was not able to see if Officer Hornback placed his knee on Totman's back, nor did she see if the officers twisted Totman's arms. Hughes testified that, when she and Totman got out of jail a couple of hours later, Totman "looked really bad," "was hunched over," and "had a bruise over his eye." A day or two after their arrest, Hughes took photographs of Totman, which purportedly showed "where [Totman's] rib was broke."

One of the nurses on duty the night that Totman was arrested, Joyce Hill, gave a sworn statement as part of Metro's internal investigation into the incident. She recalled treating Totman

by irrigating his eyes after he had been sprayed with mace or pepper spray. Later, when Totman was complaining of back pain, Nurse Hill examined him. She found no redness, bruising, or other signs of injury.

Metro submitted Totman's certified medical records from his March 6, 2006 visit to Norton Suburban Hospital in Louisville, Kentucky, which was the day after his arrest. He was treated for a chest wall contusion, a contusion on his forehead, and a thoracic strain. The hospital staff took x-rays of Totman's chest, but found "no evidence of a displaced rib fracture."

Metro also provided the district court with its Departmental Policy. This policy included extensive instructions on the proper use of force by corrections officers.

## B. Procedural background

Totman filed suit against Metro, Officer Hornback, and "Unknown Defendants Louisville Metro Corrections Officers and Nurses in the Employ of Louisville Jefferson Metro Government." In his first amended complaint, Totman brought the following five counts: (1) Officer Hornback and Unknown Defendants used excessive force against Totman and withheld medical attention from him in violation of the Fourth and Eighth Amendments of the United States Constitution; (2) Metro failed to adequately train and supervise Officer Hornback and Unknown Defendants concerning the proper use of force and the need for providing inmates with medical attention; (3) Metro failed to exercise ordinary care in hiring and retaining Officer Hornback and Unknown Defendants; (4) Officer Hornback and Unknown Defendants committed the state-law torts of assault, outrageous conduct, and intentional infliction of emotional distress; and (5) a claim against all Defendants for punitive

damages. Despite twice amending his complaint, Totman never identified any of the Unknown Defendants.

Metro and Officer Hornback moved for summary judgment on all of Totman's claims. They argued that summary judgment was appropriate due to "the absence of probative evidence." Specifically, they contended that Totman "cannot come forward with evidence that is sufficient in terms of both quantity and quality to establish the elements of his claims." Officer Hornback also raised the defense of qualified immunity, but only as it related to Totman's state-law claims.

The district court first considered Totman's claims under 42 U.S.C. § 1983 against Officer Hornback and the Unknown Defendants. It concluded that the Fourth Amendment did not apply to Totman because he was not in the custody of the arresting officer at the time of the alleged use of excessive force. The court also concluded that the Eighth Amendment did not apply because, at the time of the use of force, Totman had not yet been convicted of any offense. Accordingly, the court dismissed "Totman's § 1983 claims against Hornback and Unknown Defendants predicated on the Fourth and Eighth Amendments." The court did not address Totman's claims regarding the individual defendants' purported withholding of medical care, but Totman has not pursued this issue on appeal.

Next, the district court considered Metro's liability under § 1983. The court determined that "Totman has failed to identify a municipal policy or custom that directly caused him injury," and that Totman had failed to present any evidence to support his claims that "Metro was somehow negligent respecting the provision of medical attention for inmates" or that "Metro is liable based on hiring or training." Regarding the hiring and retention of Officer Hornback, the court noted that the

officer's "disciplinary history may be fairly characterized as dealing with predominantly attitudinal problems" and, although his record was "far from exemplary," there was "nothing in it that evidences that his continued employment made it 'highly likely' that he would use excessive force against Totman, as is alleged here." Moreover, said the court, "Totman has failed to show that a Metro policymaker made the decision to retain Hornback in furtherance of Metro policy." The court therefore dismissed Totman's § 1983 claims against Metro.

Finally, the court found that Officer Hornback was entitled to qualified immunity under Kentucky law with regard to Totman's state-law claims. These claims were therefore dismissed.

Prior to granting final judgment to Metro and Officer Hornback, the district court allowed Totman to file a second amended complaint that added a reference to the Fourteenth Amendment in his § 1983 claims. Metro and Officer Hornback then responded by filing a second motion for summary judgment regarding the new addition to Totman's complaint. They argued that Totman had not offered any evidence that Officer Hornback's conduct "shocks the conscience" under the Fourteenth Amendment, thus entitling the defendants to summary judgment. Totman replied: "Under the generalized due process clause of the Fourteenth Amendment, a § 1983 claim is viable if the behavior of the government actor 'shocks the conscience.' A corrections officer dribbling an inmate's head like a basketball should shock the conscience." (Citation omitted.)

The district court determined that the Fourteenth Amendment did apply to Totman's claim because he was a pretrail detainee at the time of the use of force, but concluded that Totman was unable to raise a genuine issue of material fact as to whether Officer Hornback's conduct shocked the conscience because "there was insufficient evidence to support a finding that Hornback acted in

bad faith." In addition, Totman "asserts no new basis under the Fourteenth Amendment for liability on the part of Metro." Accordingly, the court dismissed Totman's § 1983 claims against Metro and Hornback based on the Fourteenth Amendment. The court did not address Totman's Fourteenth Amendment claims against the Unknown Defendants. This timely appeal followed.

## II.  ANALYSIS

### A.  Standard of review

We review de novo a district court's grant of summary judgment. *ACLU of Ky. v. Grayson County*, 591 F.3d 837, 843 (6th Cir. 2010). Summary judgment is proper where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). In considering a motion for summary judgment, we must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.  Arguments of the parties

Both parties identify the following issues on appeal:  (1) whether the district court applied the correct constitutional standard to Totman's claims of excessive force, and (2) whether Metro is liable for Totman's injuries. Concerning the first issue, Totman contends that "[t]he District Court failed to apply the Fourth Amendment 'objective reasonableness' standard, but rather the far more onerous Fourteenth Amendment 'shocks the conscience' standard." Totman argues in the alternative that, if the Fourteenth Amendment does apply, then the Eighth Amendment standard applicable to

-11-

convicted prisoners should be adopted "rather than the 'shocks the conscience' test generally used to analyze substantive due process claims." And according to Totman, the evidence raises a genuine issue of material fact as to whether Officer Hornback's actions "were not a good faith effort to restore discipline, but were undertaken solely to cause harm."

Metro and Officer Hornback respond to Totman's arguments on the first issue by asserting that his claims "implicate only the Fourteenth Amendment" and not "the Fourth Amendment's 'objective reasonableness' test." They agree with Totman that the issue of which constitutional standard applies to Totman's claims of excessive force is fairly presented by this case: "Inmate Totman notes that this court has not directly answered the question of whether a [Fourth Amendment] seizure ceases when the arrested individual has been turned over to an official in a detention facility, and this appeal seeks the answer." And as to Totman's "alternative argument that the District Court, in its Fourteenth Amendment analysis, should have applied a standard equivalent to the Eighth Amendment standard," Metro and Officer Hornback contend that this argument "is irrelevant because the District Court[] in fact applied the same Eighth Amendment standard which Inmate Totman seeks."

The parties also disagree as to whether Totman has raised a genuine issue of material fact concerning Metro's potential liability for his injuries. Totman argues that Metro was deliberately indifferent to his right to be free from excessive force through its "negligent hiring, supervision, and retention of Officer Hornback," particularly "after his repeated inmate attacks." Metro responds that "Totman has not identified any custom or policy of Metro Government which could subject [Metro] to liability." It contends that "no reasonable policy maker could have concluded from [Officer

Hornback's disciplinary] infractions recorded that it was 'plainly obvious' that Officer Hornback was likely to violate inmate[s'] constitutional rights."

Totman does not address in his brief the district court's grant of summary judgment on his state-law claims, claims of withholding of medical treatment, and claims against the Unknown Defendants. He has therefore waived these claims on appeal. *See Ahlers v. Schebil*, 188 F.3d 365, 374 (6th Cir. 1999) (holding that a court may consider any claims not addressed in an appellant's brief to be waived). Officer Hornback in turn has not raised the issue of qualified immunity on appeal; therefore, this defense is deemed waived. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 403 n.18 (6th Cir. 1999) (holding that a qualified-immunity defense is deemed waived if it is "not presented to this court in the initial briefs on appeal").

**C.     Officer Hornback's liability**

Section 1983 provides a civil enforcement mechanism for inmates who suffer constitutional injuries at the hands of "[a]ny person acting under color of state law." 42 U.S.C. § 1983. Totman contends that Officer Hornback, in his capacity as a Metro corrections officer, used excessive force against Totman in violation of the latter's constitutional rights under the Fourth Amendment or, in the alternative, the Fourteenth Amendment.

At the time of oral argument, this circuit had not yet determined the exact point at which a Fourth Amendment "seizure" ended and "pretrial detention" began in the excessive-force context. Such a determination is significant because different constitutional amendments apply depending on how one characterizes the status of a person in official custody—whether that person is held pursuant to a "seizure," a "detention," or a "sentence." *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir.

2002) ("The question of which amendment supplies [a § 1983 plaintiff's] rights is not merely academic, for the standards of liability vary significantly according to which amendment applies.").

Both parties therefore asked the court to decide which constitutional standard applied to Totman's claim of excessive force during his booking process.

Since oral argument, this court has decided the legal issue. In *Aldini v. Johnson*, Nos. 09-3183, 09-3258, __ F.3d __, 2010 WL 2573467 (6th Cir. June 29, 2010), the court ruled that a defendant arrested without a warrant is protected from excessive force by the Fourth Amendment until his or her probable-cause hearing. *Id.* at *8 (holding that "the dividing line between the Fourth and Fourteenth Amendment zones of protection at the probable-cause hearing"). The circumstances of this case—specifically, Totman's citation and arrest summary report—demonstrate that he was arrested without a warrant. We will accordingly analyze Totman's claim under the Fourth Amendment excessive-force standard.

"The Fourth Amendment prohibits the use of excessive force by arresting and investigating officers." *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006). Under the Fourth Amendment standard, courts must determine whether a particular use of force is reasonable based on "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). This reasonableness inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 367.

In evaluating the reasonableness of the force used, courts must examine "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others,

-14-

and whether he is actively resisting arrest or attempting to evade arrest by flight." *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001) (citations and quotation marks omitted). "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

During his deposition, Totman testified that he was involved in two distinct physical altercations with Metro corrections officers. The first took place in the booking area, where Officers Stachoulas and Hornback took him to the floor. Officer Hornback testified that Totman was being disruptive and refusing to follow instructions concerning the booking process. Officers Stachoulas and Hornback accordingly used force in order to gain compliance. Significantly, Totman does not dispute that he was refusing to follow the officers' commands or even that he physically resisted their efforts to take him to the single cell. He thus has not refuted Officer Hornback's testimony that some force was needed to engender Totman's compliance with the officers' instructions.

The sole issue, therefore, is whether the force used by Officer Hornback was unconstitutionally excessive. We are *not* asked to determine whether the cumulative force allegedly used by all of the involved officers was excessive because *only Officer Hornback* was sued as a named defendant.

Totman was unable to specifically identify Officer Hornback as one of those who was kicking him or who drove a knee into his back. He conceded that he did not know which officers were purportedly beating him once he was on the floor and, after a careful review of the record, we have found no evidence indicating that Officer Hornback himself kicked or beat Totman. Officer

-15-

Hornback, in contrast, testified unequivocally that he did not put his knee on Totman's back and that he did nothing more than maintain a vascular-restraint hold on Totman until the latter was handcuffed. The incident report in fact states that Officer Stachoulas was the one who put his knee on Totman's back, but Totman did not name Officer Stachoulas as a defendant. And despite being given two opportunities to amend his complaint, Totman failed to add any of the other officers involved in this incident as defendants in the case.

As the party responding to a properly supported motion for summary judgment, Totman bore the burden to "set out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e)(2). But Totman offered no evidence to refute Officer Hornback's testimony that Hornback did not kick, beat, or knee Totman while the two of them were in the booking area. Our dissenting colleague suggests that this deficiency is remedied by Totman's second amended complaint, which alleges that Totman suffered extensive injuries because of his treatment by Officer Hornback. We recognize that a "verified complaint . . . carries the same weight as would an affidavit for the purposes of summary judgment." *See El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008). But Totman's second amended complaint is not in fact verified by Totman (although it is titled a "verified" complaint). Nevertheless, the first amended complaint contains the same factual allegations as the second amended complaint and includes a verification. The only difference between the first and second amended complaints is that the second amended complaint added claims under the Fourteenth Amendment. We therefore will consider whether the statements in Totman's first amended complaint raise a genuine issue of material fact. (Totman's original complaint, although verified, did not contain specific facts to support his claims.)

To constitute evidence sufficient to support or oppose a motion for summary judgment, an affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Totman verifies that his first amended complaint "is true and correct to the best of [his] knowledge and belief," which indicates that the allegations of the complaint go beyond Totman's personal knowledge and extend to matters within Totman's belief. His beliefs, however, do not meet the evidentiary standard set forth in Rule 56(e)(1) of the Federal Rules of Civil Procedure. *See id.*; *see also Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (holding that the affiant's "statement . . . based upon his 'belief' . . . did not demonstrate the personal knowledge required by Fed. R. Civ. P. 56(e)").

Totman's deposition testimony clarified which portions of the complaint were within Totman's knowledge and which portions were merely his beliefs. He testified that, although he knew that Officer Hornback took him to the ground in the booking area, he did not know who beat him while he was down. Totman's allegation in his complaint that Officer Hornback beat him is therefore nothing more than speculation, and speculation is not admissible evidence. *See* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

Moreover, whether Totman identified Officer Hornback as one of the officers who beat him *is* a dispositive issue in this case, despite the dissent's arguments to the contrary. Totman has sued only Officer Hornback for the alleged beating. But Officer Hornback has sworn that he did not beat Totman, and Totman's claim that he was beaten by unknown officers does not contradict Officer

Hornback's statement because the record contains no statements from the other officers in the booking area on the night in question denying that they were involved in the altercation. Given the possibility that one or more of them beat Totman, there is no factual dispute in the record that would preclude a grant of summary judgment in favor of Officer Hornback.

The dissent also notes Totman's purported allegation "that he only verbally resisted the officers prior to their tackling him." But we are unable to locate any statement in Totman's complaint that supports this contention. Although Totman alleges that he "pleaded with the officers to stop," he does not say that he was complying with the officers' commands, either verbally or physically. Accordingly, Totman's verified complaint does not raise a genuine issue of material fact concerning the first alleged instance of force against him.

The second instance of force that Totman describes purportedly occurred in the single cell in the rear security area. At that point, Totman was handcuffed. Totman provided the following testimony during his deposition about which officers took him to the cell:

Q. Okay. Did Officer Hornback escort you to the single cell?

A. I believe he was one of them. There was [sic] a few of them. Him, the—I can't think of that guy's name for nothing. Stav . . .

Q. Stavros [Stachoulas]?

A. Stavros.

Q. Stavros?

A. Stavros.

Q. Okay, So it was Officer Hornback and Officer Stavros [Stachoulas] that took you back to the single cell?

> A.     And Peterson.
>
> Q.     Who?
>
> A.     Peterson.
>
> Q.     Okay.
>
> A.     And I believe the—that the other—the one that Maced me, I believe he was like in the back—back of them. You know, there was [sic] like three or four of them that put me in there.

Totman was thus not entirely certain that Officer Hornback was among the officers who took him to the single cell. In any event, he does not contend that the officers used excessive force while they were in the process of escorting him.

Totman was also unable to describe with particularity what took place once he was there. He said that "they" continued to "rough[] [him] up a little bit," but then conceded that he was not actually punched while in the rear security area. Totman further testified that the officers "continue[d] kicking me around a little bit" and that he "just kind of played opossum." He was lying face down and therefore could not tell "who was doing what." Totman was then left in the cell handcuffed for two or three hours.

Officer Hornback testified at his deposition that he did not escort Totman to the rear security area and that he did not go back to that area at all during Totman's detention in the single cell. Given Totman's lack of certainty concerning whether Officer Hornback was one of the officers who took him to the rear security area, and his total inability to identify which officers purportedly kicked him once he was there, Totman has failed to raise a genuine issue of fact concerning whether Officer Hornback used excessive force against Totman while the latter was in the single cell. And we again

note that, despite having two opportunities to amend the complaint, Totman failed to name as a defendant any individual officer other than Officer Hornback. Totman's uncertainty cannot create a genuine issue of material fact where Officer Hornback flatly denies even being present in the rear security area, much less using any force against Totman while there. *See, e.g.*, *Schlueter v. S. Energy Homes, Inc.*, 252 F. App'x 7, 9-10 (6th Cir. 2007) (holding that an "equivocal and conclusory" statement in an affidavit provided to oppose summary judgment cannot give rise to a genuine issue of material fact).

In sum, Totman has not raised a genuine issue of material fact regarding Officer Hornback's alleged use of excessive force in either the booking area or the rear security area. The district court's grant of summary judgment to Officer Hornback on Totman's excessive-force claim was therefore appropriate due to Totman's lack of proof.

**D.     Metro's liability**

Totman argues that Metro failed to exercise ordinary care in hiring, supervising, and retaining officers "such as" Officer Hornback. He provides a substantive argument, however, concerning only Metro's decision to retain Officer Hornback. Totman's arguments about other officers, about Metro's decision to hire Officer Hornback, and about Metro's purported failure to supervise Officer Hornback are therefore deemed waived. *See Spirko v. Mitchell*, 368 F.3d 603, 612 (6th Cir. 2004) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (citation and internal quotation marks omitted)).

Where a plaintiff seeks to hold a municipality liable for negligently retaining a particular employee, the plaintiff must prove that the decision to retain the employee "reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 411 (1997). A finding of culpability cannot depend on the general probability that any officer inadequately screened will inflict some injury. "Rather, it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id.* at 412 (emphases in original). And "[w]here, as here, a municipality's liability is alleged on the basis of the unconstitutional actions of its employee[], it is necessary to show that the employee[] inflicted a constitutional harm." *Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002).

Totman's negligent-retention claim against Metro is premised on his claim that Officer Hornback violated Totman's constitutional right to be free from excessive force. But we have concluded that Totman failed to raise a genuine issue of material fact as to whether Officer Hornback used excessive force against him. Because Totman's claim against Hornback fails, he has not established a constitutional violation on which to base a claim of municipal liability. Totman's claim against Metro is accordingly without merit. *See id.*

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

**CLAY, Circuit Judge, dissenting.** Totman has raised a genuine issue of material fact concerning whether Officer Hornback subjected Totman to excessive force in the booking area of Metro, but he has not raised a genuine issue of material fact concerning whether Metro was negligent in its decision to retain Officer Hornback. I would therefore vacate the district court's grant of summary judgment as to Officer Hornback and remand the case to the district court.

While going through the booking process at Metro, Totman was involved in a physical altercation with several corrections officers. Given the timing of the altercation, Totman's claims implicate the Fourth Amendment. *See Aldini v. Johnson*, 609 F.3d 858, 860 (6th Cir. 2010). The majority concludes that Totman's claims would fail under even the more protective Fourth Amendment standard required by *Aldini*. However, I would find that there are disputed issues of material fact.

The facts and evidence indicating that Totman's claim against Officer Hornback should be permitted to proceed are as follows: Totman admitted that he spoke to his girlfriend during the booking process and responded to Officer Stachoulas' order not to speak to his girlfriend by saying "Is it my fault you can't get a date?" (Dist. Ct. R.E. 39 Ex. 7 at 12). According to Totman, he turned to walk away, and Officers Stachoulas and Hornback physically attacked him. The officers claim that Totman was kicking, punching, and physically resisting. However, even the officers admit that they took Totman to the ground, put him in a vascular restraint hold, handcuffed him, and sprayed his eyes with pepper spray. Totman has alleged in a verified complaint that he "sustained a rib fracture and ligament damage in both arms as a result of the beating perpetrated by Officer Hornback

and the other officers [and that he] is currently scheduled to have surgery performed on both arms as a direct result of this assault."[1]  (Am. Compl. ¶ 8).

The officers, including Officer Hornback, were allowed to use a reasonable amount of force to compel Totman to comply with the booking process.  However, Totman's allegations in his complaint that he suffered extensive injuries and his contention during his deposition that he only verbally resisted the officers prior to their tackling him to the floor create questions as to whether the amount of force the officers used in response to Totman's admittedly snide comment was excessive.[2]  Because this Court must credit Totman's allegations on this appeal, there are disputed questions of material fact as to whether the officers used excessive force under the circumstances.

Furthermore, Totman has presented sufficient allegations that Officer Hornback was personally involved in the alleged constitutional violations to sustain a claim against Officer Hornback.  Totman specifically identified Officers Stachoulas and Hornback as the first two officers who attacked him, and they "[took] my arms and pretty much pile-[drove] me head first in the concrete." (R.E. 39 Ex. 7 at 15).  In addition, Totman's deposition testimony makes clear that, after

---

[1]The majority argues that the allegations in the verified complaint do not meet the evidentiary standard set forth in Federal Rule of Civil Procedure 56(e)(1) because they extend beyond Totman's personal knowledge to matters within Totman's belief.  However, the allegations concerning the extent of Totman's injuries, as well as the allegations that Officer Hornback was one of the two officers who grabbed Totman and threw him to the ground, are clearly matters within Totman's personal knowledge.  Thus, at least on these issues, the verified complaint "carries the same weight as would an affidavit for purposes of summary judgment." *See El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008).

[2]The majority contends that Totman makes no allegation that he only verbally resisted the officers prior to their tackling him.  However, while Totman does not say the exact words "I only verbally resisted," his description of what transpired in the moments before the altercation clearly describe only verbal resistance.  According to Totman: "[Officer Stavros] tells me, 'If you talk to your girlfriend again, I'm going to put you both in the hole; it don't matter to me.'  And I said, 'Is it my fault you can't get a date?'  And I turned to walk away.  And that's when him and Hornback attacked me." (Dist. Ct. R.E. 39 Ex. 7 at 12).

Officer Hornback took Totman to the ground, Officer Hornback was one of the officers who continued to attack him while he was on the ground.

Contrary to the majority's characterization of the issue, the dispositive inquiry is not constrained to the question of whether Totman could identify Officer Hornback as the officer who kicked him or drove a knee into his back after Totman was taken to the ground. Considering that Totman was face down and three or four officers were on top of him and inflicting physical injury upon him at the same time, it would have been impossible for Totman to identify with specificity which officers engaged in which part of the beating. However, Totman has alleged that Officer Hornback was one of the officers beating him, and Officer Hornback had the motive to punish Totman for his alleged lack of cooperation in response to the police officers' commands. Thus, Totman has presented evidence sufficient to survive summary judgment suggesting that Officer Hornback's actions caused, at least in part, the extensive injuries that Totman suffered. In view of all of the circumstances, Totman's allegations provide adequate circumstantial evidence that Officer Hornback is one of the likely perpetrators of the alleged constitutional violations.

Because the disputed material facts and relevant circumstantial evidence are sufficient to permit Totman's claim against Officer Hornback to be presented to the trier of fact, I respectfully dissent.